**THE SHAPIRO FIRM, LLP**
Robert J. Shapiro (RS-3220)
Jonathan S. Shapiro (JS-3068)
500 Fifth Avenue, 14th Floor
New York, New York 10110
Telephone: 212-391-6464
Facsimile: 212-719-1616

*Local Counsel for Plaintiff*

**SCHIFFRIN BARROWAY
   TOPAZ & KESSLER, LLP**
John A. Kehoe (JK-4589)
Stuart L. Berman
David Kessler
Darren J. Check
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056

*Attorneys for Plaintiff*



FEB 27 2008
U.S.D.C. S.D. N.Y.
CASHIERS

**08 CV 1973**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ILMARINEN MUTUAL PENSION INSURANCE COMPANY, | : | CASE NO. |
| | : | |
| Plaintiff, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| VIVENDI, S.A., JEAN-MARIE MESSIER and GUILLAUME HANNEZO, | : | **COMPLAINT** |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

i

### Table of Contents

I.    NATURE OF THE ACTION.................................................................2

II.   JURISDICTION AND VENUE ...........................................................7

III.  PARTIES...........................................................................................13

    A.   Plaintiff.....................................................................................13

    B.   Vivendi .....................................................................................13

    C.   Individual Defendants...............................................................14

IV.  FACTUAL BACKGROUND .............................................................17

    A.   Vivendi's Unrestrained Growth through Acquisitions...............17

    B.   Vivendi's Use of Improper Accounting to Artificially
        Inflate Its Stock Price  ..............................................................21

        1.   Accounting Rules Applicable to Foreign Issuers...........21

        2.   Defendants Failed to Timely Write Down Impaired Goodwill ...................24

            (i)    Canal+ ................................................................26

            (ii)   U.S. Filter ..........................................................33

        3.   Defendants Improperly Consolidated Vivendi's Balance Sheet..................34

        4.   Defendants Improperly Recognized Revenue ...............40

        5.   Defendants Improperly Inflated Canal+'s Assets..........42

        6.   Defendants Improperly Manipulated Vivendi's Reported EBITDA ..........43

            (i)    Improper EBITDA Adjustments during the
                Second Quarter of 2001........................................44

            (ii)   Improper Adjustments of UMG's EBITDA.........45

        7.   Defendants Failed to Disclose Vivendi's 2% Interest
            in Elektrim Telekomunikacja.........................................47

    C.   Defendants Concealed Vivendi's Growing Liquidity Crisis...................48

|  | 1. | Defendants Failed to Disclose Vivendi's Inability to Generate Expected Cash Flows from the Company's Costly Acquisitions ...............49 |

|  | 2. | Defendants Failed to Disclose the Insufficiency of Vivendi's Working Capital ..........................................................................49 |

|  | 3. | Defendants Failed to Disclose Certain Off Balance Sheet Liabilities .........50 |

|  | 4. | Defendants Failed to Disclose Acceleration Clauses in Vivendi's Loans...53 |

|  | 5. | Defendants Failed to Disclose Material Commitments Concerning Cegetel and Maroc Telecom .......................................................................54 |

|  |  | (i)  Cegetel's Current Account ...................................................54 |

|  |  | (ii)  The Maroc Telecom Side Agreement .................................56 |

|  | 6. | Defendants Failed to Disclose Vivendi's 2001 Stock Buybacks.................57 |

|  | 7. | Magnitude of the Undisclosed Liquidity Crisis ...........................................58 |

| | D. | The Truth Begins to Emerge ...................................................................................60 |

V.  | FALSE AND MISLEADING STATEMENTS ...............................................................69 |

VI.  | DEFENDANTS' SCIENTER .........................................................................................115 |

VII.  | LOSS CAUSATION .......................................................................................................121 |

VIII.  | INAPPLICABILITY OF THE STATUTORY SAFE HARBOR.................................124 |

IX.  | PRESUMPTION OF RELIANCE ..................................................................................125 |

X.  | TOLLING OF THE STATUTE OF LIMITATIONS ....................................................126 |

XI.  | CLAIMS FOR RELIEF ..................................................................................................127 |

FIRST CLAIM FOR RELIEF Violations of Section 11 of the Securities Act (Against All Defendants)..............................................................................................................127

SECOND CLAIM FOR RELIEF Violations of Section 12(a)(2) of the Securities Act (Against All Defendants)......................................................................................................129

THIRD CLAIM FOR RELIEF Violations of Section 15 of the Securities Act (Against Defendants Messier and Hannezo) ...........................................................................131

FOURTH CLAIM FOR RELIEF Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants) .......................................133

FIFTH CLAIM FOR RELIEF Violation of Section 20(a) of the Exchange Act (Against Defendants Messier and Hannezo) ..........................................................................135

SIXTH CLAIM FOR RELIEF Common Law Fraud (Against All Defendants).....................136

SEVENTH CLAIM FOR RELIEF Common Law Negligent Misrepresentation (Against All Defendants).........................................................................................................137

EIGHTH CLAIM FOR RELIEF Unjust Enrichment (Against All Defendants) ...................139

XII.   PRAYER FOR RELIEF..............................................................................................140

Ilmarinen Mutual Pension Insurance Company ("Plaintiff"), by its undersigned attorneys, alleges the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, *inter alia*, an investigation made by and through their undersigned counsel, which included, among other things, a review of (1) Vivendi Universal, S.A. (now known as Vivendi, S.A. and hereafter referred to as "Vivendi" or the "Company") filings with the Securities and Exchange Commission ("SEC") and the Commission des Operations des Bourse ("COB") (now part of the Autorité des marchés financiers), the French equivalent of the SEC; (2) Vivendi press releases; (3) public statements by or on behalf of Vivendi and/or the other Defendants; (4) analyst reports concerning Vivendi; (5) newspaper and other media coverage regarding Vivendi, its business, and/or the Individual Defendants (as defined below); and (6) pleadings in litigation naming Vivendi as a defendant, including *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) (S.D.N.Y.) (the "Securities Class Action"); *SEC v. Vivendi Universal, S.A., Jean-Marie Messier and Guillaume Hannezo*, No. 03 Civ 10195 (PKC) (S.D.N.Y.) (the "SEC Action"); *Capitalia Asset Management SGR, S.p.A. and Capitalia Investment Management S.A. v. Vivendi, S.A., Jean-Marie Messier and Guillaume Hannezo*, No. 07 Civ. 5742 (RJH) (S.D.N.Y); and *Norges Bank v. Vivendi, S.A., Jean-Marie Messier and Guillaume Hannezo*, No. 07 Civ. 7370 (RJH) (S.D.N.Y) (the "Norges Bank Action").

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiff's investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiff's allegations are known only by the Defendants named herein or are exclusively within their

1

custody or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after Plaintiff has had a reasonable opportunity for discovery.

## I.　　NATURE OF THE ACTION

1.　　Between at least October 30, 2000 and August 14, 2002 (the "Relevant Period"), defendant Jean-Marie Messier ("Messier"), Vivendi's Chief Executive Officer ("CEO") and Chairman (until he was forced to resign on July 3, 2002), and defendant Guillaume Hannezo ("Hannezo"), Vivendi's Chief Financial Officer ("CFO") (until he resigned on July 9, 2002), issued materially false and misleading statements and caused Vivendi to file materially false and misleading financial statements with the SEC in violation of the federal securities law and common law.

2.　　Immediately before and during the Relevant Period, defendant Messier caused Vivendi to embark on an extraordinary $77 billion acquisition binge that rapidly transformed Vivendi from a small centuries-old French-based water utility into a huge international media and telecommunications conglomerate. In pursuit of this rapid transformation, Messier and Hannezo (collectively the "Individual Defendants") reported the Company's strong revenue and earnings, and portrayed Vivendi as a company that was generating sufficient cash flow and earnings to satisfy its debt obligations on approximately $21 billion in debt that it amassed to finance its massive $77 billion acquisition spree. As a result of the Individual Defendants' repeated upbeat earnings announcements and assurances concerning the Company's growth and its ability to meet its debt obligations, the price of Vivendi's American Depository Shares ("ADSs") traded on the New York Stock Exchange ("NYSE"), and ordinary shares traded on Compartment A of Eurolist (formerly the *Premier marché*) by Euronext Paris S.A. (hereinafter referred to as the "Paris Bourse"), was artificially inflated throughout the Relevant Period.

2

3.     As the Individual Defendants knew but did not disclose, Vivendi's operations and financial results were dramatically weaker than what their public statements portrayed. For example, immediately prior to and during the Relevant Period, Vivendi (using its increasingly inflated stock as currency to finance many of its acquisitions) bid aggressively for several large companies, and substantially overpaid for them. Subsequent events (unbeknownst to investors) confirmed that these acquired entities could not generate sufficient cash flow to justify their high acquisition cost, with the result being that Vivendi's balance sheet was bloated with tens of billions of dollars of inflated "goodwill" whose value had been materially impaired and should have been written down. The failure of the Vivendi conglomerate to generate earnings in line with its publicly-touted estimates further threatened the Company's liquidity and its ability to generate the amount of cash flow from operations necessary to satisfy its obligations on over $21 billion worth of debt.

4.     To conceal the deteriorating state of Vivendi's newly constructed corporate empire, Defendants engaged in a variety of improper asset and revenue inflating practices immediately prior to and during the Relevant Period that enabled the Company to artificially inflate its reported assets, revenue, income and earnings per share ("EPS"), thereby rendering Vivendi's publicly filed financial statements and other communications regarding the Company's financial performance complained of herein to be materially false and misleading.

5.     Vivendi's improper accounting (as detailed in Section IV.B, *infra*) included, *inter alia*, failing to timely write-off of over €29 billion in goodwill associated with Vivendi's acquisitions, including its acquisitions of U.S. Filter Corp. ("U.S. Filter") and Canal+ S.A. ("Canal+"). Defendants' failure to take timely write-offs for impaired goodwill in violation of U.S. generally accepted accounting principles ("U.S. GAAP") caused Vivendi to improperly

3

delay recognizing offsetting charges of over €29 billion against the Company's earnings during the Relevant Period. As a result, Vivendi's reported earnings and EPS were artificially inflated under U.S. GAAP by tens of billion of dollars during the Relevant Period.

6.      In addition to its failure to properly account for goodwill, Vivendi also engaged in a variety of improper revenue recognition and expense-deflating practices, and other related misconduct, to artificially inflate its reported financial performance during the Relevant Period. These practices included, *inter alia*, (a) reporting and consolidating into its own reported financial results billions of dollars of revenue from entities such as Cegetel and Telecom (both defined below) in which Vivendi held only a minority stake and in which Vivendi did not control, in violation of U.S. GAAP (as detailed in Section IV.B.3, *infra*); (b) recognizing 100% of the revenue "upfront" (*i.e.* in contract year one) on billions of dollars of multi-year contracts in a practice internally referred to as "booking backlog," even though Vivendi had not yet performed its obligations under those multiyear contracts and U.S. GAAP required that the revenue on such contracts be recognized ratably over time when Vivendi actually performed the contracted-for services (as detailed below in Section IV.B.4, *infra*); (c) improperly inflated Canal+'s assets (as detailed below in Section IV.B.5, *infra*); (d) improperly manipulated Vivendi's reported EBITDA (as detailed below in Section IV.B.6, *infra*); and (e) failed to disclose a 2% interest in Elektrim Telekomunikacja (as detailed below in Section IV.B.7, *infra*).

7.      The foregoing improper accounting practice not only allowed Vivendi to keep its stock price artificially high, but also facilitated the Individual Defendants' fraudulent efforts to conceal the Company's growing liquidity crisis. For example, on December 6, 2001, defendant Messier assured the investing public that "Vivendi Universal is in a very strong position, with solid performance in virtually every business," and just weeks later (after having announced that

4

it would raise $2.5 billion by selling a $1.5 billion interest in British Sky Broadcasting Plc

("BSkyB") and a $1.06 billion interest in Vivendi Environnement) stated that certain asset sales

would give Vivendi "room to manoeuvre" for additional acquisitions and enable it "to cover any

eventual needs from different opportunities for strategic partnerships." On December 17, 2001,

Vivendi then announced that it would be acquiring USA Networks for approximately $10 billion.

       8.     Unbeknownst to investors, however, Vivendi's business at that time was anything

but "strong" and decidedly lacked "room to manoeuvre." To the contrary, as *The Wall Street*

*Journal* later reported, the Company then faced a potentially catastrophic liquidity crisis:

> On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.
>
> "*I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat*," wrote Mr. Hannezo, the company's chief financial officer. "*All I ask is that all of this not end in shame*."
>
> *That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis.* Mr. Hannezo . . . implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.
>
> When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, *Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem*, according to two directors who were there.
>
> The board endorsed the USA Networks deal . . . . But Vivendi was already in dire financial straits. . . .
>
> As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought. *That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.*

"How Messier Kept Cash Crisis at Vivendi Hidden for Months; Media Giant Was at Risk Well Before Investors Knew," *The Wall Street Journal*, Oct. 31, 2001, at A1 (emphasis added).

9.    Without publicly disclosing the adverse material facts facing the Company, and while affirming and materially misrepresenting the truth concerning the Company's actual prospects, financial performance, improper accounting practices and liquidity situation, the Individual Defendants did not hesitate to take advantage of the market's ignorance of the truth by causing Vivendi to purchase numerous companies during the Relevant Period using artificially inflated Vivendi stock as currency. By maintaining an artificially inflated price for Vivendi's stock, the Individual Defendants were able, in essence, to purchase tens of billions of dollars worth of The Seagram Company Ltd.'s ("Seagram"), Canal+'s and other entities' stock at a discount since Vivendi was paying for its interest in these companies with a currency (Vivendi's own stock) that was really worth a fraction of its publicly-traded price.

10.    Eventually the weight of Defendants' material misrepresentations and distorted financial results collapsed upon the scheme. In June 2002, an immediate and severe cash shortage threatened Vivendi's continued viability. Over the course of the next several weeks, the truth about Defendants' deception was revealed.

11.    On July 3, 2002, Vivendi's board ousted Messier. Hannezo left the Company just days later. Thereafter, the Company's new management was forced to disclose that the Company would immediately have to secure both bridge and long-term financing to avoid default on its largest credit obligations. During a hearing before the French Parliament in September 2002, Vivendi's new chairman admitted that had Messier remained Vivendi's CEO beyond July 3, 2002, the Company undoubtedly would have gone bankrupt "within 10 days."

12.    The Individual Defendants may have succeeded in their plan to transform Vivendi into a multinational conglomerate, but the Company, and ultimately its shareholders, would come to pay an enormous price for Messier's and Hannezo's unchecked ambition and their concomitant material misrepresentations.  Among other things, Defendants' actions resulted in (1) a crippling drop in the prices of Vivendi's ordinary shares traded on the Paris Bourse and ADSs traded on the NYSE when the fraud was finally revealed; (2) the Company's de-listing from the NYSE; (3) an onslaught of civil litigation; and (4) the imposition of a massive civil fine by the SEC, as more fully particularized below.

13.    The disclosure of Defendants' fraud caused a precipitous decline in the trading prices of the Company's securities.  The Company's ADSs lost 85% of their value from their Relevant Period high of $75.50 and its ordinary shares declined 83.9% from their Relevant Period high of €86.50.  These declines resulted in significant damage to the Company's shareholders, including Plaintiff.

## II.    JURISDICTION AND VENUE

14.    The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) and §77o; Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.  The claims alleged herein also arise under common law.

15.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a); Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and principles of supplemental jurisdiction in accordance with 28 U.S.C. § 1367.

16.     In connection with the acts and course of conduct alleged herein, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities markets.

17.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d). Many of the acts, transactions and conduct that occurred in furtherance of Defendants' fraudulent scheme complained of herein occurred in substantial part and/or had an effect in this District, including the creating and implementation of the manipulative devices and contrivances. Further, Vivendi, and the Individual Defendants conducted substantial business and had substantial contacts within this District during the Relevant Period.

18.     Vivendi is headquartered in Paris, France, but conducted substantial business and maintained the Company's U.S. headquarters in this District during the Relevant Period and through the present. In addition, defendant Messier became a resident of the District beginning in 2001 when he moved himself and his family into a Manhattan penthouse apartment. As alleged in the Securities Class Action, during a February 17, 2002 CNN interview, defendant Messier explained that he moved to New York in furtherance of his responsibilities as Vivendi's CEO and Chairman of the Board. Specifically, that

> Moving to New York, yes there [were] very simple reasons. The first one Vivendi Universal has 50,000 U.S. employees. They have a boss. Where is the boss? The boss is in the U.S. He's working there. I can meet with them. I can spend time with them. He is really the boss.
>
> The second goal was Vivendi International is a new group for many U.S. investors in the media field. We need and I needed to spend more time with the U.S. Universal community to explain the Vivendi Universal story, to go through all reasons of performances of prospects, and I think that it's just better to do it being in American, than being outside.

8

19.    The Defendants' domestic conduct was not "merely preparatory" or perfunctory acts, but led directly to Plaintiff's losses. Accordingly, this Court may properly apply subject matter jurisdiction over the claims of foreign purchasers of Vivendi ordinary shares traded on foreign exchanges, including the Paris Bourse, under the "conduct test" articulated by the Second Circuit, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States "directly caused" a plaintiff's losses. The facts alleged herein show that substantial activity in furtherance of Defendants' fraud occurred within the United States and directly caused Plaintiff's losses.

20.    The Court has already exercised subject matter jurisdiction over the federal securities claims in the Securities Class Action. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) (the "Court's Opinion"). In denying Defendants' motions to dismiss pursuant to Rule 12(b)(1), the Court held that it possessed subject matter jurisdiction over claims brought by foreign purchasers who acquired Vivendi ordinary shares on foreign exchanges. *Id.* at 169-70. The Court Opinion noted that Defendants did not dispute that (1) Messier and Hannezo had relocated to the United States in September 2001; (2) that Vivendi filed Forms 20-F and 6-K with the SEC during the Relevant Period; (3) that Defendants disseminated other materials to investors in the United States; and (4) that Vivendi made numerous acquisitions in the United States. *Id.*

21.    The Court further held that the Securities Class Action complaint sufficiently alleged grounds for the Court to exercise subject matter jurisdiction over the claims of foreign investors against Defendants including that, in furtherance of the alleged scheme, Vivendi had

9

acquired well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks, and to successfully accomplish this plan, took on a $21 billion debt while allegedly fraudulently assuring all investors "through false and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debt." *Id.*

22.    In addition to substantial U.S. conduct that occurred in furtherance of the fraud that is alleged herein, Vivendi has a vast U.S. presence that justifies the exercise of subject matter jurisdiction over the claims of Plaintiff who, relying on the health and value of Vivendi's substantial U.S. businesses, acquired Vivendi ADSs traded on the NYSE and/or ordinary shares traded on the Paris Bourse, and were defrauded by the Defendants' material misrepresentations.

23.    Defendants perpetrated the alleged fraud upon Plaintiff through material misrepresentations made in connection with the Company's $77 billion acquisition spree, during which time the Company made several high profile acquisitions, spending in excess of $54 billion for various U.S.-based entities. For example, the following companies, among others, were acquired in whole or in part by Vivendi.

| **COMPANY ACQUIRED** | **U.S. LOCATION** | **PURCHASE PRICE** |
| --- | --- | --- |
| Waste Management Inc. | Houston, TX | € 103.5 million |
| U.S. Filter Corp. | Palm Desert CA | $ 6.2 billion |
| Seagram Company Ltd. | University City, CA | $ 34 billion |
| Uproar.com | New York, NY | $ 128 million |
| MP3.com, Inc. | San Diego, CA | $ 400 million |
| Emusic.com | San Diego, CA | $ 24 million |
| Houghton Mifflin Co. | Boston, MA | $ 2.2 billion |
| EchoStar Communications Corp. | Littleton, CO | $1.5 billion |
| USA Networks | New York, NY | $10.3 billion |

24.    In addition to the U.S acquisitions, the Court's Opinion noted that Messier and Hannezo were alleged principal actors in this scheme and spent half their time within the United

10

States from the middle through the end of the Relevant Period, for the specific purpose to increase investments by U.S. investors in Vivendi. *Id.*

25.    The Court also found that it was reasonable to infer from the decision by Messier and Hannezo to move to the United States during the Relevant Period, allegedly to better direct Vivendi's operations and to more effectively promote misleading perceptions on Wall Street, that the alleged fraud on the NYSE was a "substantial" or "significant contributing cause" of the foreign investors' decisions to purchase the Company's stock abroad. *Id.* at 170.

26.    In an Order denying reconsideration of the Court's Opinion in the Securities Class Action, the Court reconfirmed that it had subject matter jurisdiction over foreign investors' claims against Defendants because, *inter alia*, (i) allegedly false statements emanated from the U.S.; (ii) Messier and Hannezo, Vivendi's two highest officers, moved to and operated Vivendi from the U.S. allegedly to better implement the fraudulent scheme; and (iii) Messier and Hannezo carried out significant acts in the U.S. in furtherance of the alleged fraud and as alleged controlling officers of Vivendi. *See In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004) (the "Reconsideration Opinion"). The Reconsideration Opinion specifically noted that "this Court concurs with Judge Baer's opinion finding jurisdiction over this dispute pursuant to the conduct test . . . ." *Id.* at *7.

27.    Further, pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over Plaintiff's claims because Defendants' improper conduct had an impact upon the NYSE, the U.S. market on which Vivendi sold ADSs. Defendants' improper conduct, including that which was carried out in the U.S, artificially inflated the price of the Company's securities and affected the integrity of the prices paid for Vivendi securities in the United States and abroad. There was but

11

a single worldwide market for Vivendi ordinary shares traded on foreign exchanges, including the Paris Bourse, and ADSs traded on the NYSE, which traded in tandem, and that market was defrauded by Defendants' conduct, causing extensive effects in this country and abroad.

28.     In the U.S., Vivendi sold securities whose prices were artificially inflated by means of false and misleading statements in financial reports, a Form F-4 Registration Statement filed with the SEC on October 30, 2000, and various press releases. Vivendi actively marketed and sold these securities in the U.S. despite its false reporting of its financial condition as alleged herein. Many, if not most, of the Company's press releases shared a New York dateline. Further, throughout the Relevant Period, Vivendi regularly filed Forms 20-F and Forms 6-K with the SEC that contained materially false and misleading information as detailed herein.

29.     Vivendi also organized and participated in meetings in New York with the financial community, including with Wall Street analysts, to review and report on Vivendi's purported financial results. As alleged herein, Defendants issued materially false and misleading statements during those meetings.

30.     According to Vivendi's Form 20-F for the fiscal year ended December 31, 2001, filed with the SEC on May 28, 2002 (the "2001 Form 20-F"), over 54% of Vivendi's long lived assets, then valued at €53.5 billion, were located in the U.S. The 2001 Form 20-F also reported that Vivendi's U.S. revenue exceeded €7 billion. As alleged in the Norges Bank Action, on January 19, 2002, at a Los Angeles luncheon, Defendant Messier stated that Vivendi was "forty percent within the United States and sixty percent out of the states," and in a February 17, 2002 interview on CNN, stated that the Company had "50,000 U.S. employees."

31.     As news came to light near the end of the Relevant Period of Vivendi's near-bankruptcy, the SEC commenced an investigation within this District. In addition, the SEC

12

brought enforcement proceedings against Vivendi, Messier and Hannezo in this District for

violations of U.S. securities laws, alleging substantial fraudulent conduct in the U.S., including

the issuance of false and misleading statements to investors in the U.S. The SEC asserted that

certain of the acts and practices described in the SEC Action that constituted violations of the

Securities Act and the Exchange Act occurred within this District. In further support of the SEC

Action, the SEC also alleged that the Court had subject matter jurisdiction because Vivendi

conducted business and maintained offices in this District during the Relevant Period, and,

during at least part of the Relevant Period, Messier and Hannezo resided in this District. As part

of the resolution of the SEC Action, Defendants executed a consent decree entered in this Court.

32.    Further, in April 2004, the SEC issued a cease-and-desist order against John

Luczycki, Vivendi's former Chief Accounting Officer and controller, who resided in New York,

finding that during the period December 2000 to July 2002, he had violated United States anti-

fraud statutes.

## III.    PARTIES

### A.    Plaintiff

33.    Ilmarinen Mutual Pension Insurance Company, founded in 1961, is based in

Helsinki, Finland is a mutual pension insurance company with approximately €24 billion in

assets under management.

### B.    Vivendi

34.    Vivendi is a "société anonyme" organized under the laws of France with its

corporate headquarters at 42 Avenue de Friedland 75380, Paris, Cedex 08, France. Vivendi has

offices in this District at 800 Third Avenue, New York, NY 10022. Between October 30, 2000

and April 26, 2006, Vivendi was known as Vivendi Universal, S.A.

13

35.    During the Relevant Period, Vivendi described itself as a global conglomerate engaged in business that was focused primarily on two core areas: "Media and Communications" and "Environmental Services." Vivendi's Media and Communications business was divided into five segments: (a) Music; (b) Publishing; (c) TV and Film; (d) Telecom; and (e) Internet. Vivendi was formed through the December 2000 merger of Vivendi, Seagram and Canal+, with Vivendi continuing as the surviving parent entity (this three-way merger is hereinafter referred to as the "Merger Transactions"). Vivendi is named herein as a defendant in its own right and as the successor entity and successor-in-interest to Vivendi Universal, S.A., Seagram and Canal+. At all times relevant to this Complaint, Vivendi sold shares in the form of ADSs on the NYSE and ordinary shares on the Paris Bourse.

36.    Vivendi Environnement, a subsidiary of Vivendi, operates the Company's worldwide environmental services business, including its water utility operations.

## C.    **Individual Defendants**

37.    Defendant Jean-Marie Messier ("Messier") was Vivendi's CEO and Chairman of the Board during the Relevant Period until he was forced to resign from the Company on July 3, 2002. He had been CEO of Vivendi's predecessor company since 1994. Messier was also Chairman of the Supervisory Board of Vivendi Environnement and Canal+. Messier was a control person of Vivendi within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. As alleged in the Securities Class Action, Messier received compensation of $4.8 million in 2001 despite the Company's record loss, as well as various other perquisites, including use of a $17 million New York penthouse apartment the Company had acquired for him.

14

38.     Defendant Guillaume Hannezo ("Hannezo") was Vivendi's CFO during the Relevant Period, until he resigned from the Company on July 9, 2002. As the Securities Class Action alleged, the *Associated Press* reported that Hannezo was a "close collaborator" of Messier. Hannezo was a control person within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

39.     It is appropriate to treat the Individual Defendants as a group for group pleading purposes and to presume that the materially false and misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, are the collective actions of the Individual Defendants. As officers and/or directors and controlling persons of a publicly held company whose ADSs were registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

40.     The Individual Defendants, by virtue of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. The Individual Defendants were provided with copies of the documents alleged herein to

be misleading, prior to or shortly after their issuance, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

41.    The Individual Defendants directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants were privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein, and were involved in the drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications that were materially false and misleading as alleged herein. Messier and Hannezo both were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

42.    Because of their Board memberships and/or executive and managerial positions with the Company, the Individual Defendants had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

16

## IV.    **FACTUAL BACKGROUND**

A.    **Vivendi's Unrestrained Growth through Acquisitions**

43.    Vivendi's origins date back to 1853 when it began as a French-based water company named Compagnie Générale des Eaux ("CGE"). CGE had focused primarily on the water market until 1976 when Guy Dejouany became CEO and, following a series of acquisitions, expanded into other business areas, including waste management, energy, transport services and construction and property.

44.    Messier became chairman of CGE in June 1996, and changed its name to Vivendi in April 1999. Beginning at least as early as 1998, and continuing throughout the Relevant Period, Messier embarked on a multi-billion dollar acquisition spree that transformed Vivendi into a multinational conglomerate. For example, as alleged in the Securities Class Action, in the two years prior to the Relevant Period, Vivendi acquired the following companies:[1]

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED |
|---|---|---|
| Quotidien Sante | 4/9/98 | 100% |
| Linjebuss AB | 4/15/98 | 66.7% (33% owned) |
| Havas SA / Old | 6/2/98 | 70% (30% owned) |
| Cia de Saneamento do Parana | 6/8/98 | 41.38% |
| Ediciones Doyma SA | 6/25/98 | 50% |
| l'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 100% |

---

[1] Pre-existing ownership interest, if any, is shown in parenthesis.

17

| OVP-Vidal | 11/23/98 | 100% |
|---|---|---|
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 1/5/99 | 100% |
| Cendant Software | 1/12/99 | 100% |
| Pathe | 1/26/99 | 19.6% (5% owned) |
| FCC | 3/5/99 | 28% |
| Aique | 4/20/99 | 100% |
| US Filter Corp. | 4/30/99 | 100% |
| SL Tunnelbanan AB | 5/4/99 | 60% |
| MediMedia | 5/12/99 | 100% |
| 18 Litre Water Division | 5/20/99 | 100% |
| Sani Gestion Inc. | 6/11/99 | 100% |
| MUSIDISC | 6/30/99 | 99.02% |
| Canal+ | 7/22/99 | 15% (34% owned) |
| British Sky Broadcasting Plc | 7/22/99 | 4% (20.5% owned) |
| Aqua Alliance Inc. | 8/24/99 | 17% (83% owned) |
| Pathe | 9/30/99 | 80.2% (19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/9/99 | 49% |
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 2/29/00 | 100% |

| Three V Health Inc. | 2/29/00 | 100% |
|---|---|---|
| Haniel Rohr; Kanal Service & Haniel Industrie Reinignung | 3/28/00 | 100% |
| Prize Central Network | 3/29/00 | 100% |
| HD Offshore | 5/30/00 | 100% |
| Quod Bonum BV | 8/17/00 | 80% |
| Prelude et Fugue | 9/20/00 | 100% |
| Poland.Com SA | 9/21/00 | 55.01% |

45.    Messier's rapid growth strategy required Vivendi to finance the acquisitions, causing the Company to accumulate a massive amount of debt. For example, in March 1999, Vivendi financed its $6.2 billion acquisition of U.S. Filter by raising approximately €5.7 billion through a convertible bond offering. Similarly, in December 1999, Vivendi increased its equity investment in Elektrim Telekomunikacja ("ET"), a polish conglomerate, to $1.2 billion (or 49% of ET's equity), by investing an additional $250 million in cash and converting an earlier $615 million loan into ET shares.

46.    By June 2000, Vivendi had significantly expanded and diversified its holding when it announced the massive €29.5 billion three-way Merger Transactions among Vivendi, Seagram (which owned Universal Studios and Polygram Records) and Canal+. The Merger Transactions closed on December 8, 2000, and as the Company announced in its 2000 Annual Report:

> As a result of the Merger Transactions, we are one of the world's leading media and communications companies, with assets that include the world's largest recorded music company, one of the largest motion picture studios and film libraries in the world and leading businesses in the global telecommunications, television, theme park, publishing and Internet industries. We believe that we will become a fully integrated global media and communications

19

company capable of providing a diverse array of entertainment and information over wired and wireless access devices using cable, Internet, satellite and broadcast networks.

47.    According to press reports, the Merger Transactions "transformed the Company into the second-largest global media empire after AOL Time Warner." *See,* "Vivendi Provides Critics Some Revenue Numbers To Chew On," *The New York Times,* Feb. 12, 2002.

48.    Following the Merger Transactions, many Wall Street analysts expected Vivendi to ensure that the newly merged and recently acquired businesses were achieving desired synergies before consummating any new acquisitions, as the Securities Class Action alleged. Defendants, however, pursued a much different strategy. In a span of just sixteen months after the massive three-way Merger, Vivendi acquired significant equity positions (or added to its existing equity positions) in the following companies, several of which Vivendi acquired outright:

| COMPANY | CLOSING DATE | INDUSTRY | % ACQUIRED |
|---|---|---|---|
| Maroc Telecom | 12/21/00 | Telecom Services | 35% |
| MUSIDISC | 1/31/01 | Multimedia | 0.98% (99.02% owned) |
| Medicine Publishing | 2/1/01 | Publishing | 100% |
| HCCOM | 2/19/01 | Publishing | 100% |
| Uproar Inc. | 3/23/01 | Internet Company | 100% |
| GetMusic LLC | 4/25/01 | Internet Content | 50% (50% owned) |
| Editions Juris Service | 4/25/01 | Multimedia | 100% |
| Emusic.Com Inc. | 6/14/01 | E-commerce | 100% |
| RMM Records & Video | 6/25/01 | Music | 100% |
| Scoot Europe NV | 7/27/01 | Broadcast Server | 50% (50% owned) |

| Houghton Mifflin Co. | 8/3/01 | Publishing | 100% |
|---|---|---|---|
| MP3.Com | 8/28/01 | Internet Content | 100% |
| Elektrim Telekomunikacja | 9/4/01 | Telecom Services | 2% (49% owned) |
| Mediabright | 9/12/01 | Applications Software | 100% |
| Studio Canal | 10/12/01 | Motion Pictures Services | 14.8% (85.2% owned) |
| Multithematiques | 12/17/01 | Cable TV | 27% |
| EchoStarCommunications | 1/22/02 | Satellite Telecom | 10% |
| Koch Group Recorded Music | 2/15/02 | Music | 100% |
| USA Network Entertainment | 5/7/02 | Cable TV | 93% |

49.    Like the pre-Merger Transactions acquisitions, the vast majority of these post-Merger Transactions acquisitions were paid for by using Vivendi stock as currency, or by borrowing against future earnings. Thus, to sustain its growth by acquisition strategy, it was crucial for Vivendi and the Individual Defendants to continue to report favorable financial results to keep Vivendi's stock price artificially high and to maintain Vivendi's favorable credit ratings that were essential to support the Company's existing debt and its access to additional debt financing.

**B.    <u>Vivendi's Use of Improper Accounting to Artificially Inflate its Stock Price</u>**

50.    Throughout the Relevant Period, Vivendi made use of various types of improper accounting machinations that had the purpose and effect of materially misstating Vivendi's financial results, as more particularized below.

**1.    <u>Accounting Rules Applicable to Foreign Issuers</u>**

51.    During the Relevant Period, Vivendi filed financial statements with the SEC that were represented to have been prepared in conformity with GAAP in France ("French GAAP").

The SEC allows foreign issuers, such as Vivendi, to prepare their primary financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that an understanding of such financial statements is facilitated via reconciliation to U.S. GAAP. Specifically, Item 17 of the Instructions to Form 20-F requires that foreign issuers' "financial statements shall disclose an information content substantially similar to financial statements that comply with U.S. generally accepted accounting principles."

52.    Vivendi filed its 1999, 2000, 2001 consolidated annual financial statements with the SEC on Form 20-F and represented that the Company's financial statements had been prepared in conformity with French GAAP and purportedly reconciled to U.S. GAAP. In addition, Vivendi's 2001 Form 20-F represented that beginning in 2002 the Company's financial information would be reported on a U.S. GAAP basis and reconciled to French GAAP. Despite these representations, Vivendi deviated from U.S. GAAP in several material respects when it reported the results of its operations during the Relevant Period.

53.    GAAP are the fundamental principles, consisting of rules, procedures and conventions that are recognized by the accounting profession as essential and define accepted accounting practice at a particular time. As set forth in the Financial Accounting Standards Board's ("FASB") Statement of Concepts ("CON") No. 1, one of the fundamental objectives of financial reporting is that financial statements provide accurate and reliable information concerning an entity's financial performance during the period being presented. Specifically, CON No. 1, ¶42 states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about

future enterprise performance, those expectations are commonly
based at least partly on evaluations of past enterprise performance.

54.     Further, Regulation S-X provides that financial statements filed with the SEC that
do not conform to GAAP are presumed to be misleading and inaccurate. Defendants'
representations that Vivendi's financial statements had been reconciled to U.S. GAAP were
materially false and misleading because the financial statements materially distorted the
Company's true financial performance, as described herein.

55.     The Company's financial statements for at least fiscal years 1999, 2000 and 2001
did not fairly and accurately represent Vivendi's financial position and operations and were
materially false and misleading because, as more particularized below in Section IV.B, Messier
and Hannezo manipulated the Company's reported financial results through a plethora of
accounting practices that violated at least the following basic GAAP precepts:

1.     That financial reporting should provide information about the economic
resources of an enterprise, the claims to those resources, and the effects of
transactions, events, and circumstances that change resources and claims
to those resources (CON No. 1, ¶ 40);

2.     That financial reporting should provide information about how
management of an enterprise has discharged its stewardship
responsibilities to owners for the use of enterprise resources entrusted to it.
To the extent that management offers securities of the enterprise to the
public, it voluntarily accepts wider responsibilities for accountability to
prospective investors and to the public in general (CON No. 1, ¶ 50);

3.    That financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (CON No. 2, ¶¶ 58-59);

4.    That information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (CON No. 2, ¶¶ 79, 80);

5.    That conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered (CON No. 2, ¶¶ 95, 97);

6.    That revenues and gains generally should not be recognized until realized or realizable, and that revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (CON No. 5, ¶ 83); and

7.    That the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (CON No. 6, ¶ 145).

### 2.    **Defendants Failed to Timely Write Down Impaired Goodwill**

56.    During the Relevant Period, Vivendi's financial statements were materially false and misleading and were prepared in violation of U.S. GAAP and SEC rules and regulations because, *inter alia*, the Company failed to timely record an impairment in the value of its reported goodwill. In so doing, Vivendi misled investors about cash flows it expected to receive from certain of its recent acquisitions.

24

57.    "Goodwill" is an accounting term used to reflect the portion of the market value of a business entity that is not directly attributable to its assets and liabilities. When one company purchases another for more than its book value – *i.e.*, the amount of its assets minus its liabilities – it is required to record goodwill as an asset in its financial statements and to present it as a separate line item on its balance sheet.

58.    As noted above, prior to and during the Relevant Period, Vivendi engaged in an acquisition spree, which, in the aggregate, resulted in the acquisition of interests in other entities that Vivendi valued in excess of *$77 billion.* Vivendi utilized the "purchase method" of accounting for these acquisitions, in accordance with Accounting Principles Board ("APB") Opinion No. 16, *Business Combinations*, which sets the amount of goodwill to be recorded as follows:

> The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill.

ABP Opinion No. 16, ¶11.

59.    Pursuant to APB Opinion No. 16, the cost of the acquired entity is determined by the fair value of the consideration acquired or issued, whichever is more determinable. Specifically, paragraphs 74-75 of APB Opinion No. 16 set forth the requirements for valuing stock used to effect an acquisition for purposes of determining the "cost of the acquired company" as follows:

> The fair value of securities traded in the market is normally more clearly evident than the fair value an acquired company. Thus, the quoted market price of an equity security issued to effect a business combination may usually be used to approximate the value of an acquired company.

> \*        \*        \*

25

> If the quoted market price is not the fair value of the stock . . . the consideration received should be estimated even though measuring directly the fair values of the assets received is difficult.

60.     Purporting to apply these principles, Vivendi reported that it had recorded €12.54 billion of goodwill in connection with its Canal+ acquisition and €4.6 billion in connection with its U.S. Filter acquisition, but violated U.S. GAAP by failing to timely write down impaired goodwill in connection with these acquisitions when circumstances indicated that the carrying amount of these two assets would not be fully recoverable.

      (i)     **Canal+**

61.     In connection with the Merger, Vivendi valued the cost of Canal+ at €12.53 billion, and recorded goodwill at more than 100% of this cost, or €12.54 billion.

62.     In the fourth quarter of 2001, Vivendi recorded a €6 billion impairment charge in the value of Canal+ goodwill under French GAAP. This was followed by an additional €3.8 billion charge under French GAAP for impairment in the value of Canal+ goodwill during the quarter ended June 30, 2002. Accordingly, by June 2002, Vivendi had written off €9.8 billion, or approximately 78%, of the total €12.53 billion cost to acquire Canal+, under French GAAP.

63.     However, although Vivendi had recognized the initial €6 billion impairment to goodwill under French GAAP in the fourth quarter of 2001 attributable to the Canal+ acquisition, Vivendi did not take *any* impairment to goodwill under U.S. GAAP until the first quarter of 2002. The Company purported to explain this disparate accounting treatment in its 2001 financial statements:

> *Goodwill Impairment Charge and Impairment of Other Long-Lived Assets*
>
> As required under both French and U.S. GAAP, Vivendi Universal reviews the carrying value of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally

26

and externally, indicate that the carrying amount may not be recoverable. Under French GAAP, measurement of any impairment is based on fair value. In 2001, following the recent market decline, particularly in the Internet, media and telecommunications industries, our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest). Under U.S. GAAP, measurement of any impairment is based on the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, Accounting for the Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed of (SFAS 121). ***SFAS 121 requires that an impairment loss be recognized whenever the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of an asset are less than the net carrying value of the asset. On this basis no impairment was indicated and accordingly the goodwill impairment charge was reversed.***

(emphasis added.)

64.    Statement of Financial Accounting Standards ("SFAS 142"), *Goodwill and Other Intangible Assets*, requires intangible assets, such as goodwill, to be reviewed for impairment in accordance with SFAS 121, *Accounting For The Impairment Of Long-Lived Assets And For Long-Lived Assets To Be Disposed Of*. SFAS 121 provides that an impairment loss shall be recognized if the carrying amount of an intangible asset is not recoverable and if its carrying amount exceeds its fair value. Specifically, SFAS 121 provides:

1.    An entity shall review long-lived assets and certain identifiable intangibles and goodwill related to those assets to be held and used for impairment ***whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.*** The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:

a.    A significant decrease in the market value of an asset

b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset

c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator

27

d.      An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset

e.      A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that *demonstrates* continuing losses associated with an asset used for the purpose of producing revenue.

(emphasis added). SFAS 121 expressly requires a goodwill impairment to be recognized if the future cash flows expected to be generated by an asset are less than the carrying amount of an asset. Accordingly, by not taking any write-offs for impaired goodwill under U.S. GAAP in 2000 or 2001, Vivendi essentially represented to investors that the cash flows Vivendi expected to receive from Canal+ equaled or exceeded its carrying value. As set forth below, however, Defendants knew, or recklessly ignored, that Vivendi did not expect to receive cash flows from Canal+ equal to its carrying value long before it recognized goodwill impairments. Accordingly, Defendants violated SFAS 121 by failing to write down impaired goodwill for Canal+ before the first quarter of 2002.

65.      Specifically, well before the first quarter of 2002, Defendants knew that the value of Canal+'s "smart cards" had been severely compromised by known piracy beginning at least as early as March 1999. As the Securities Class Action alleged, Canal+ filed a civil action against NDS Group PLC ("NDS") in the United States District Court for the Northern District of California in March 2002 (the "March 2002 Complaint"), which alleged that since March 1999, NDS "permitted and facilitated the proliferation of counterfeit smart cards that enabled users to circumvent the security measures built into the Canal+ conditional access system," causing Canal+ to suffer losses over a billion dollars. According to the March 2002 Complaint,

Through the investment of millions of dollars and thousands of man-hours into research and development, Canal+ was able to implement effective security measures in its smart cards used to control access to digital television signals. *These measures proved to be more than*

28

> *adequate to protect Canal+ smart cards from piracy until March 1999, when Canal+ smart card software code was copied and published on a web site called "DR7.com." Thereafter, counterfeit Canal+ smart cards began to appear on the market. The proliferation of these counterfeit cards resulted in massive harm to Canal+ and to the system operators who depend on the security of Canal+ smart cards...*
>
> *If smart cards pirates obtain Canal+' new software code, the damage to Canal+ will be irreparable. What is released to the public cannot be put back in the bottle. The market for counterfeit smart cards is massive and the harm from such activities is global.*

(emphasis added.)

66.    As Canal+ further alleged in the March 2002 Complaint:

> Canal+ seeks redress in this action for the damage caused by its competitor, NDS. Through the calculated expenditure of millions of dollars for specialized equipment and other resources, NDS sabotaged C+ Technologies' [Canal+ Technologies'] previously unbroken security system for access to digital televison signals. In apparent disregard for both the law and its own reputation, NDS caused the development of counterfeit "smart cards," permitting a theft of digital television on a massive scale. *Canal+ estimates that Defendants' illegal conduct has caused it harm in excess of $1,000,000,000.*
>
> *          *          *
>
> C+ Technologies has spent substantial time and money developing countermeasures to combat each type of pirate smart card that resulted from the publication caused by NDS. These countermeasures are created by a team of C+ Technologies engineers and then tested and broadcast by the digital television operators to stop unlawful television viewing by counterfeit card consumers. *The countermeasures, however, are quickly made obsolete by new versions of software for the counterfeit cards that pirate make available after analyzing the countermeasures. Counterfeiters are able to quickly and effectively respond to each new countermeasure because they have access to the UserROM code published on DR7.com.* C+ Technologies cannot stop this counterfeiting without implementing a fundamental change in the design of the smart card. At enormous expense, C+ Technologies is currently developing a new smart card design and will soon transition its existing network to the new design. This transition will be consuming and expensive

because each and every legitimate smart card will have to be exchanged.

*The mass production of counterfeit C+ Technologies smart cards has damaged not only Groupe Canal+'s direct revenue through its digital television operators, but has also hurt the sales efforts of C+ Technologies and Canal+ USA. Conditional access system competitors, especially NDS, used the existence of counterfeit C+ Technologies cards as a competitive weapon in the sales process among content providers and system operators.* For example, Canal+ has encountered competitors, including NDS, pointing out to customers and potential customers in the United States and elsewhere throughout the world, the breach of C+ Technologies' security schemes as evidence that Canal+ cannot guarantee the integrity of its systems. In highlighting this supposed security breach, Defendants have deceptively failed to disclose that the breach exists solely because of Defendants' own unlawful sabotage.

*As a result of the counterfeiting, Canal+ has lost sales opportunities and has lost customers to its competitors.* NDS has also used the counterfeiting to attempt to disrupt Canal+' relationships with existing customers.

*Another loss occasioned by NDS to Groupe Canal+ is the loss of pay per view subscriptions.* One common type of counterfeit access is a modification of a legitimate smart card. These cards, commonly referred to as "MOSC" cards (i.e., "Modified Official Smart Cards"), are legitimate cards, sometimes with valid basic subscriptions, that have been altered so they grant their owners rights that they have not purchased. Some MOSC cards grant free access to upgraded packages or to every subscription channel; other have a number of pay per view television "credits" for which the owner has not paid. These cards did not exist before the publication on DR7.com and but for that publication they would have not have been produced. *The widespread use of MOSGs has caused Groupe Canal+ and pay television operators from the Canal+ group to lose revenues from premium programs as subscribers are able to have their smart cards altered to receive premium programs without paying for them.*

(emphasis added.)

67.     Similarly, according to the Securities Class Action, in a declaration filed on May 13, 2002 in connection with Canal+'s action against NDS, Jean-Marc Racine, the Director of Marketing for Canal+, and former CEO of Canal+, stated:

30

*[J]ust as Canal+ was getting a foothold in the U.S., the piracy of our conditional access system became known and Canal+' efforts to gain U.S. market share, based out of Milpitas and later Cupertino, were negatively impacted. A company's reputation, as well as market perception of the quality of its product is important in order to win new business, and the piracy of Media Guard had a negative impact on Canal+.*

I had several experiences with Canal+ customers that to me evidence the impact of the piracy of MediaGuard on Canal+' Northern California operations. For example, Canal+ Technologies, Inc. expended a great deal of resources tying to win a contract with Cablevision in New York. We lost this contract to NDS, and Cablevision told us that it was choosing NDS because NDS knew how to combat piracy better than Canal+. In another instance, I believe that NDS actively flaunted the hacking of Canal+' conditional access system when it was in competition with Canal+ to win a full end-to-end system contract from RCN, an over-builder based in Princeton, New Jersey, which has significant operations in major U.S. cities, including San Francisco. Canal+ Technologies, Inc.'s only real competition for the RCN business was NDS. Several times, RCN, which was in contact with NDS at the time, mentioned the piracy of MediaGuard that had occurred after our codes were published on DR7. *On May 29, 2001, RCN asked us to comment on several articles and other information contained on web sites regarding the hacking and counterfeiting of Canal+' smart cards. . . .* This set of articles is extensive and had to take more than a few hours to prepare. It was sent by an RCN engineer who I believe was also in contact with NDS in this competition with Canal+. RCN asked us to justify why there was a piracy problem with our smart cards and told us that NDS had a much better solution and no piracy problem in Europe. *RCN postponed their decision on selecting a supplier for a new end-to-end system, but I believe that the piracy problem caused confusion and created doubts at RCN about the performance and quality of Canal+' products.*

*Since then, Canal+ Technologies, Inc. has successfully won only one contract in the United States*, WinFirst in Sacramento. As the piracy of MediaGuard became known, we have put management time and efforts into reassuring the customer. We had to set up a Security Committee and explain to the customer how to fight piracy, the legal actions taken in Europe, and the engineering steps that we would use and were using to combat piracy. These efforts would not have been needed if MediaGuard had remained secure. *The security problems associated with our conditional access system[s] have had a*

> **negative impact on the sales efforts in the United States of Canal+**
> **Technologies, Inc. based in Cupertino.**

(emphasis added.)

68.     In addition, as the Securities Class Action alleged, on March 2, 2001, *New Media*

*Markets* reported:

> **Some estimates put the level of piracy as high as 30 percent of the**
> **pay-television subscriber base in Western Europe.**
>
> \*        \*        \*
>
> The impact of piracy was made clear last month by Spanish pay-
> television group Sogecable, which runs both the Canal Satelite
> Digital digital-satellite platform and the Canal+ Espana premium
> service. The company, which has just over two million subscribers,
> said that pirate cards were being used by between 100,000 and
> 300,000 homes in Spain. *This is hurting the premium channel and*
> *pay-per-view services in particular.*

(emphasis added.)

69.     Despite the foregoing, when Vivendi reported its results for the quarter ended

March 31, 2002, the Company disclosed:

> Canal+ Premium Channel revenue fell 3% in the quarter because of
> lower advertising revenue and lower subscription revenue owing to
> lower average analogue subscribers.

In truth, and in fact, Canal+ premium channel revenue was materially adversely affected by the

undisclosed piracy of Canal+'s technology noted above. By failing to write down Canal+'s

goodwill under U.S. GAAP until the first quarter of 2002, Defendants misrepresented that this

known piracy had no effect on the Company's value and anticipated cash flow when this plainly

was false. Accordingly, Defendants violated SFAS 121 by continuing to represent publicly that

Canal+ was as valuable after this piracy (which Canal+ itself had estimated to cause harm in

excess of $1 billion), as it was before this theft.

70.     Moreover, although Defendants caused Vivendi to belatedly record goodwill impairments totaling €16.6 billion in the first quarter of 2002 under U.S. GAAP, after having taken no impairment charges under U.S. GAAP in FY 2001, and defendants downplayed the significance of these write-offs by attributing them to the adoption of a new accounting standard, SFAS No. 142, that changed the practice for goodwill accounting.[2]  By delaying any recognition of goodwill impairment under U.S. GAAP, until after Vivendi had adopted SFAS No. 142, Defendants avoided having to admit that Vivendi's expected cash flows from its acquisitions had been materially impaired well before its adoption of the new accounting standard.

71.     Tellingly, following Messier's and Hannezo's ouster, the Company recorded an additional €3.8 billion impairment in the value Canal+'s goodwill at the end of the first half of 2002 under French GAAP, even though Canal+ had reported revenue growth of 8% during this period.  The fact that Vivendi's new management took additional write-offs of Canal+'s goodwill during a period when its business was actually improving further evidences that the impairment should have been taken earlier.

        **(ii)     U.S. Filter**

72.     Just as it did with Canal+, Vivendi similarly violated GAAP by failing to write down impaired goodwill for its U.S. Filter acquisition.  When Vivendi acquired U.S. Filter in September 1999, it paid approximately 46 times U.S. Filter's 1998 earnings.  As a result, Vivendi recorded approximately €4.6 billion in goodwill for U.S. Filter.  However, Vivendi's reported goodwill on U.S. Filter was materially inflated during the Relevant Period because,

---

[2]     Prior to the June 2001 adoption of SFAS 142, companies were permitted to amortize goodwill over a period not to exceed forty years. SFAS 142 prohibited the amortization of goodwill and required companies to carry goodwill on their balance sheets as an asset.

*inter alia,* (a) Vivendi was misstating U.S. Filter's reported revenue by improperly recognizing all of the revenue expected to be earned on multi-year contracts at the contracts' inception, as set forth more fully below at Section IV.B.4, *supra,* and (b) because companies comparable to U.S. Filter were sold during the Relevant Period at prices that were significantly less than what Vivendi had paid for U.S. Filter. (For example, although Vivendi paid 46.5 times U.S. Filter's purported operating profit when Vivendi acquired it in September 1999, in 2001 the German conglomerate RWE purchased a comparable U.S. water company, American Water, for only about 16 times earnings before interest and taxes). These events and circumstances confirmed that U.S. Filter's goodwill was impaired under U.S. GAAP prior to the fourth quarter of 2001. In the end, Vivendi recorded a staggering €2.6 billion impairment in the value of U.S. Filter's assets, but, in violation of U.S. GAAP, did not record this impairment until the end of the fourth quarter of 2001.

73.     After Vivendi's board ousted Messier and Hannezo, Vivendi's new management implicitly admitted that the goodwill impairments that prior management had recognized for entities other than Canal+ and U.S. Filter were also insufficient. For example, on August 14, 2002, Vivendi reported additional goodwill impairments (exclusive of those pertaining to Canal+) totaling €7.2 billion on a French GAAP basis for the three months ended June 30, 2002. By contrast, the Company's financial statements for the three months ended March 31, 2002 (prepared on a French GAAP basis) showed that no charge for goodwill impairment was recognized during the March 31, 2002 quarter.

**3.     Defendants Improperly Consolidated Vivendi's Balance Sheet**

74.     In addition to the failure to timely write down impaired goodwill that resulted in materially misstating Vivendi's financial results, Defendants also improperly consolidated

34

revenue from certain investments in which Vivendi possessed less than a 50% ownership interest. This improper consolidation further inflated at least the Company's 1999, 2000 and 2001 revenues and operating income in violation of basic U.S. GAAP precepts.

75.    For example, Vivendi included in its consolidated financial statements for 1999, 2000 and 2001 the complete financial results of the French telecommunications company Cegetel Group ("Cegetel"), and included in its 2001 consolidated financial statements the complete financial results of the Moroccan telecommunications company Maroc Telecom S.A. ("Maroc Telecom"), despite the fact that Vivendi held only a minority interest in both companies.

76.    GAAP permits the consolidation of related entities onto a company's balance sheet when certain specific requirements are satisfied. Specifically, Accounting Research Bulletin ("ARB") No. 51 provides:

> The purpose of consolidated statements is to present, primarily for the benefit of the shareholders and creditors of the parent company, the results of operations and the financial position of a parent company and its subsidiaries essentially as if the group were a single company with one or more branches or divisions. There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a **_controlling_** financial interest in the other companies.

(emphasis added.)

77.    U.S. GAAP, however, limits the circumstances under which such consolidation is proper. In general, majority control is a prerequisite for consolidation. ARB No. 51, as amended by SFAS No. 94, provides:

> **_The usual condition for a controlling financial interest is ownership of a majority voting interest_**, and, therefore, as a general rule **_ownership by one company, directly or indirectly, of over fifty_**

> ***percent of the outstanding voting shares*** of another company is a
> condition pointing toward consolidation.

(emphasis added.) While majority control is typically required for consolidation, the Emerging

Issues Task Force's ("EITF") Abstract No. 96-16 permits minority shareholders possessing

certain rights to overcome the presumption that consolidation requires a majority voting interest

in certain limited circumstances. Specifically:

> The Task Force believes that minority rights (whether granted by
> contract or by law) that would allow the minority shareholder to
> effectively participate in the following corporate actions should be
> considered substantive participating rights and would overcome the
> presumption that the investor with a majority voting interest should
> consolidate its investee:
>
> 1.      Selecting, terminating, *and* setting the compensation of
> management responsible for implementing the investee's policies and
> procedures; [and]
>
> 2.      Establishing operating *and* capital decisions of the investee,
> including budgets, in the ordinary course of business.

EITF No. 96-16. While the Task Force noted that the above examples were merely illustrative

and not necessarily all-inclusive, U.S. GAAP clearly limits the circumstances under which

consolidation of entities in which a company owns less than 50% interest is permitted.

78.     In fact, APB 18, *The Equity Method of Accounting for Investments in Common

Stock*, provides special rules for accounting for an entity of which a company owns between 20-

50% and over which the company has the ability to exercise significant influence. Specifically,

APB 18 provides:

> In order to achieve a reasonable degree of uniformity in application,
> the Board concludes that an investment (direct or indirect) of 20% or
> more of the voting stock of an investee should lead to a presumption
> that in the absence of evidence to the contrary an investor has the
> ability to exercise significant influence over an investee. ***Under the
> equity method, an investor recognizes its share of the earnings or
> losses of an investee in the periods for which they are reported by
> the investee in its financial statements.*** An investor's share of

36

> earnings or losses from its investment is ordinarily shown in its income statement as a single amount. The Board recognizes that determining the ability of an investor to exercise such influence is not always clear and applying judgment is necessary to assess the status of each investment.

APB 18 (emphasis added).

79. Vivendi violated U.S. GAAP by consolidating into its financial statements the results of Cegetel, in which it held only a 44% interest, into its own results for 1999, 2000 and 2001, and the results of Maroc Telecom, in which it held only a 35% interest, into its own results for 2001. Vivendi should have accounted for these entities using the equity method of accounting, rather than fully consolidating their complete financial results into Vivendi's own financial statements.

80. In addition, Vivendi violated SFAS 95, *Statement of Cash Flows*, by improperly consolidating entities whose cash it could not access. Specifically, SFAS 95 ¶ 15 of provides:

> The information provided in a statement of cash flows . . . should help investors, creditors, and others to (a) assess the enterprise's ability to generate positive future net cash flows; (b) assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing . . .

Vivendi's disclosures concerning its cash flows, rather than helping investors to assess its ability to generate positive future cash flows and its ability to meet its obligations, painted a materially false picture of the Company's finances by including cash on its balance sheet that it had no right to access.

81. In addition, under French GAAP, exclusive control and the power to direct the financial and operational policies of an enterprise is required in order to consolidate results. Furthermore, French GAAP states that enterprises are *excluded* from consolidation where severe

and long lasting restrictions substantially call into question the control or influence exercised over the enterprise.

82.    Vivendi did not possess controlling financial interest in, at least, Cegetal and Maroc Telecom and therefore should not have consolidated the financial statements such companies with its own. Indeed, the Shareholder Agreement between Vivendi and Cegetel, as described in Vivendi's 2000 Form 20-F, contained a key clause that blocked Vivendi from making operating and capital decisions in the ordinary course of Cegetel's business. The clause states:

> If all of BT, Mannesmann and Transtel dissent, *we [Vivendi] cannot cause Cegetel Group to*:
>
> -    create or acquire shares in any entity which Cegetel Group or companies it controls hold less than 100% of the shares and voting rights; or
>
> -    subject to some exceptions, *acquire, dispose of, lease or loan a material amount of assets* or significantly reduce or cease *any material business operation*.

(emphasis added.)

83.    Further, with regard to Maroc Telecom, Vivendi disclosed in its 2001 Form 20-F that:

> In the course of the partial privatization of Maroc Telecom, Vivendi Universal was chosen to be a strategic partner in the purchase of an interest in Morocco's national telecommunications operator for approximately €2.4 billion. The transaction was finalized in April 2001, at which time Maroc ETm began to be consolidated in the accounts of Vivendi Universal, as we obtained control through majority board representation and share voting rights. As a leader in Moroccan telecommunications, Maroc Telecom operates 1.2 million fixed lines, has 3.7 million GSM clients and generated revenues of approximately €1.4 billion in 2001.

38

84.     Vivendi also disclosed in its 2001 Form 20-F that no other shareholders or groups of shareholders exercise substantive participatory rights, which would allow them to vote to block decisions taken by Vivendi Universal.

85.     This disclosure and the consolidation of Maroc Telecom's 2001 results were false and misleading because Vivendi only owned 35% of Maroc Telecom, and because the remaining 65% was held by a single entity – the Moroccan government. The Moroccan government did not conduct its operations based on the views of Vivendi.

86.     These improper consolidations caused Vivendi to misstate materially its financial results. Specifically, the improper consolidation of Cegetel's results with the Company's caused Vivendi to overstate its reported revenues by €3.9 billion, €5.1 billion and €6.4 billion for the years ended 1999, 2000 and 2001, respectively, while Vivendi's reported revenues were overstated in 2001 by an additional €1.4 billion as a result of the improper consolidation of Maroc Telecom, bringing its total overstatement for the year to €7.8 billion. Further, the improper consolidation of Cegetel and Maroc Telecom caused Vivendi to overstate its operating income, earnings before interest, taxes, depreciation and amortization ("EBITDA"), cash flow provided by operating activities, and reported growth rates during these years.

87.     In so doing, Vivendi overstated its reported revenue, operating income and EBITA and inflated its reported growth rates throughout the Relevant Period, providing a false impression that Vivendi had much higher revenue and income than it actually did. In turn, these falsified financial results ensured that the Company's share prices and credit ratings remained artificially high. Further, by creating the false impression that the Company could readily access these entities' cash to use for its own purposes, the improper consolidation of Cegetel and Maroc Telecom helped Defendants to conceal Vivendi's burgeoning liquidity crisis.

88.     When asked about the liquidity of the Company, Vivendi's CEO Jean-René

Fourtou ("Fourtou"), who became Vivendi's interim-CEO after Messier was forced to resign on

June 3, 2002, admitted in a June 26, 2002 conference call that "we do not have access to Cegetel

and Maroc Telecom." In an August 14, 2002 conference call with investors, Fourtou further

conceded that "Vivendi cannot access the cash flow generated by the companies [of which] it

owns less than 50%."

### 4.     Defendants Improperly Recognized Revenue

89.     In addition to failing to write down impaired goodwill and improperly

consolidating Cegetel and Maroc Telecom, Vivendi improperly recognized hundreds of millions

of revenue from (at least) its U.S. Filter subsidiary in violation of U.S. GAAP.

90.     It is a basic accounting maxim that revenue should not be recognized until it is (a)

realized or realizable and (b) earned. *See* CON No. 5, *Recognition and Measurement in*

*Financial Statements of Business Enterprises.* The conditions for revenue recognition ordinarily

are met when persuasive evidence of an arrangement exists, delivery has occurred or services

have been rendered, the seller's price is fixed and determinable, collectibility of the sales price is

reasonably assured and when the entity has substantially performed the obligations which entitle

it to the benefits represented by the revenue. *Id.* Generally, revenue should not be recognized

until the earnings process is complete. *See* SEC Staff Accounting Bulletin ("SAB") No. 101;

CON Nos. 2 and 5; SFAS No. 48; ARB No. 43; APB Opinion No. 10; and SOP 97-2.

91.     Further, SAB No. 101 provides that:

> Supply or service transactions may involve the charge of a
> nonrefundable initial fee with subsequent periodic payments for
> future products or services. The initial fees may, in substance, be
> wholly or partly an advance payment for future products or services.
> In the examples above, the on-going rights or services being provided
> or products being delivered are essential to the customers receiving

40

the expected benefit of the up-front payment. Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, *the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance and generally should be deferred and recognized systematically over the periods that the fees are earned.*

(emphasis added; footnotes omitted.)

92.    Vivendi's Form 20-F for the fiscal year ended December 31, 2001 expressly represented that the Company was following these rules with regard to revenue recognition, stating:

> *Revenues on public service contracts are recognized as services are provided.* Amounts billed and collected prior to services being *performed* are included in deferred revenues.

(emphasis added.)

93.    In contravention of these clear rules and Vivendi's stated revenue recognition policies, Vivendi, throughout the Relevant Period, improperly recognized anticipated revenue from multiyear public service contracts upon signing the contracts. As the Securities Class Action alleged, a former officer of U.S. Filter contended that Vivendi Environmental, through its U.S. Filter subsidiary, materially overstated its operating results by employing a practice internally referred to as "booking backlog." Pursuant to such practice, Vivendi improperly recognized and reported the *entire dollar amount of long-term fixed price contacts as revenue upon the signing of the contract.* According to the complaint filed in the Securities Class Action, the former U.S. Filter officer stated that because of the illicit practice, U.S. Filter overstated revenue on major contracts *by as much as ten times*. In fact, Vivendi Environmental accounted for approximately 51% of Vivendi's reported revenues and operating income during

41

the year ended December 31, 2001, with its U.S. Filter subsidiary reporting €1.32 billion in total revenue in 2000.

94.     Vivendi's financial statements were materially overstated during the Relevant Period as a result of Defendants' improper recognition of revenue on U.S. Filter in violation of GAAP.  Indeed, according to the Securities Class Action, Vivendi's management directly or knowingly condoned and encouraged the process in which employees would improperly record revenue, thereby inflating reported revenue.  Further, the term "booking to backlog" was a phrase that was widely used among U.S. Filter personnel, and the phrase was even included in monthly reports given to the Executive Board of Vivendi Environmental, according to the Securities Class Action.

### 5.     Defendants Improperly Inflated Canal+'s Assets

95.     In addition to the failure to timely write down Canal+'s impaired goodwill as discussed above, Defendants materially and improperly inflated the reported value of Canal+'s assets on Vivendi's balance sheet in other respects.  Specifically, Vivendi reported as assets on its balance sheet €250 million in "marketing rights" that Canal+ purportedly acquired through contracts with five French football league clubs.  However, as set forth below, the purported "marketing rights" provided no economic benefit to Canal+ and, accordingly, could not properly be recorded as assets.

96.     According to the Securities Class Action, after Vivendi acquired Canal+, Hannezo reviewed a memorandum dated January 29, 2001 that disclosed that the purported "marketing rights" Vivendi was recording as assets on its financial statement actually belonged to the football league, not to the five individual teams with which Canal+ had contracted.  Accordingly, these "marketing rights" provided no economic benefit whatsoever to Canal+.  Even though this

memorandum flatly warned that recording these contracts as assets would put Vivendi in a "difficult" position with respect to U.S. GAAP reporting requirements, Defendants caused the Company to recognize these "marketing rights" as assets on its financial statements in violation of U.S. GAAP.

97.     CON No. 6, *Elements of a Financial Statement*, defines "assets" as "***probable future economic benefits*** obtained or controlled by a particular entity as a result of past transactions or events." (emphasis added).  As set forth above, however, the "marketing rights" belonged to the football league, not the individual teams with which Canal+ had contracted. Accordingly, the "marketing rights" did not provide "probable future economic benefits" to Canal+ and were not "assets" within the meaning of CON No. 6.  Vivendi recorded these rights as assets in its year-end financial statements for 2000, in violation of GAAP, which were filed with the SEC on July 2, 2001.

### 6.     Defendants Improperly Manipulated Vivendi's Reported EBITDA

98.     According to the SEC Action, in order to meet ambitious earnings targets, Vivendi, at the direction of its senior executives, improperly adjusted certain reserve accounts of its subsidiaries and made other accounting entries without supporting documentation and not in conformity with U.S. GAAP.  As the SEC Action alleged, during the Relevant Period, Vivendi and the Individual Defendants referred to these improper efforts to meet or exceed earnings targets as "stretching."

99.     At the time of the Merger Transactions, Vivendi and Messier predicted that the Company would generate annual EBITDA growth of 35% during 2001 and 2002.  According to the SEC Action, in order to assure that Vivendi would reach that target, during 2001 Vivendi improperly adjusted various reserve accounts and prematurely recognized income in a manner

that was not in conformity with U.S. GAAP, including, in certain instances, with SFAS No. 5, *Accounting for Contingencies*.

(i)    **Improper EBITDA Adjustments during the Second Quarter of 2001**

100.    As the SEC Action alleged, in late June 2001, Vivendi, Messier, Hannezo and other Vivendi executives became concerned that Vivendi's EBITDA growth for the quarter ended June 30, 2001 might not meet or exceed market expectations. As a result, Vivendi, at the direction of its senior executives, made various improper adjustments that artificially inflated Vivendi's EBITDA by almost €59 million, or 5% of the total EBITDA of €1.12 billion that Vivendi reported (excluding the results of the recently-acquired Maroc Telecom) for that quarter.

101.    According to the SEC, Defendants increased Vivendi's EBITDA primarily by causing Cegetel, in the weeks leading up to Vivendi's earnings release for the second quarter of 2001, to depart from its historical methodology for determining the level of its reserve for bad debts (accounts receivable) during the second quarter of 2001. That departure resulted in Cegetel taking a lower provision for bad debts during that quarter than its historical methodology required. *This improper departure caused Cegetel's bad debts reserve for the second quarter of 2001 to be €45 million less than it should have been. As a result, Vivendi's overall EBITDA for that period was increased by the same amount.*

102.    Under U.S. GAAP, SFAS No. 5 precludes the use of reserves, including excess reserves, for general or unknown business risks, and the systemic or time release of reserves into income. Further, paragraph 23 of SFAS No. 5 states that an estimate of losses on accounts receivable "normally depend[s] on, among other things, the experience of the enterprise . . . and appraisal of the receivables in light of the current economic environment."

44

103.    According to the SEC Action, Cegetel reduced its provision for bad debts during the second quarter of 2001 without the level of documentation and analysis that was required. Further, the decision to take a lower provision for bad debts in the second quarter of 2001 occurred at a time when Cegetel was actually having *more difficulty* collecting on its bad debts, according to the SEC Action.

104.    In addition to taking a lesser bad debt provision in the second quarter of 2001, Cegetel also, at the direction of Vivendi's senior executives, improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001, according to the SEC Action. Altogether, those adjustments at Cegetel totaled €59 million and enabled Vivendi to show overall EBITDA growth of 35% for the second quarter of 2001.

105.    Those accounting adjustments at Cegetel were made without proper supporting documentation and as a result, Vivendi's reconciled U.S. GAAP financial statements (which incorporated Cegetel's results) were therefore not in conformity with the requirements of SFAS No. 5.

### (ii)    Improper Adjustments of UMG's EBITDA

106.    According to the SEC Action, various improper adjustments to Vivendi's EBITDA also occurred in the third quarter of 2001, and primarily affected the results of its music division, UMG. These improper adjustments increased UMG's reported results for the quarter ended September 30, 2001 by at least €10.125 million, or approximately 4% of UMG's total EBITDA of €250 million for that quarter.

107.    The SEC Action alleged that Vivendi improperly increased UMG's results in order to reach a pre-determined EBITDA figure at UMG for the quarter ended September 30,

2001 of €250 million. At that level, UMG would have been able to show EBITDA growth of approximately 6% versus the same period in 2000, and to outperform its rivals in the music business.

108. According to the SEC, Defendants caused at least two improper adjustments to be made to UMG's reported results in order to reach their €250 million EBITDA target. First, UMG prematurely recognized just over €3 million in deferred revenue that it received in connection with a contract between UMG and other parties, however, this payment would need to be refunded if Vivendi and the other parties to the contract failed to meet certain conditions by mid-December 2001. The recognition of this €3 million payment as income in the third quarter of 2001 was not in conformity with U.S. GAAP because those conditions were not met during the third quarter, and the payment remained refundable.

109. Second, in late October 2001, Vivendi temporarily reduced the amount of corporate overhead charges it allocated to UMG by €7 million. This reduction in the corporate overhead charges equaled the exact amount of additional earnings that Vivendi's senior executives determined that UMG would need in order to reach €250 million in EBITDA for the quarter ended September 30, 2001, according to the SEC Action.

110. This overhead allocation was not in conformity with U.S. GAAP, specifically CON No. 6, *Elements of Financial Statements*, which states that allocations should be assigned and distributed "according to a plan or a formula." Further, SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information*, provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis." During the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but

> Most of our businesses improved market share, EBITDA and free cash flow during this period of global economic slowing. Even more important, those operational performances are showing improvement at every level of our P&L. The good EBITDA to EBIT transformation ratio: 68% of incremental EBITDA translating in incremental EBIT, is a strong and positive sign. The improvement of operational free cash-flow (FCF) at a higher rate than EBITDA indicates the clear focus given in 2001 to cash management. We will continue this effort.

*    *    *

> We stay fully committed to conveying full transparency in our financial results. Vivendi Universal is not only transparent but is the only media and communications company not to change its numbers and targets, it underscores its commitment to accurate, conservative and consistent reporting in every area of its operations.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the reasons stated but, rather, to the accounting fraud discussed above in Section IV.B, *supra*, and their active concealment of the liquidity crisis discussed above in Section IV.C, *supra*. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants were not "fully committed to conveying full transparency" in Vivendi's financial results but, rather, were employing fraudulent accounting to burnish the Company's actual performance, as set forth above in Section IV.B, *supra*.

217. The March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section

97

IV.B, *supra*), including: (a) failing to timely write down overvalued assets from previous

corporate investments and acquisitions; (b) improperly consolidating into its financials revenue

from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50%

ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In

addition, the March 5, 2002 6-K contained untrue statements of material fact and omitted to state

material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as

particularized above in Section IV.C, *supra*) and that Vivendi would need to restructure its debt

obligations in order to remain solvent and avoid bankruptcy.

218.    On March 5, 2002, during an investor conference call, Messier discussed the

Company's fiscal year 2001 results and fiscal year 2002 expectations and attempted to minimize

the importance of the $12.6 billion write down in goodwill as follows:

> I just want to say a very quick points before going to your questions.
> And I - the first point here based on the fact that we experienced
> excellent operating results in the '01 and obviously that's very
> fortunate because this excellent operating results in '01 are also in the
> captive of the future and then we'll drive our future. I think that we
> build our operational reserve but what I want to point out is that if we
> continue or renewed on the EBITDA growth target results and add to
> our main in the quarter'01. We did all of this. Our operating pre
> cash flow target, we average Euro 2 million instead of the guidance
> of Euro 1.2 - 1.5 million [sic]. Obviously the fact that the more you
> go to cash the more we over this -- the guidance that we gave to the
> market is a strong sign of the quality of the casual management in
> working above the requirements and CAPEX management in'01.
> That goes to the same direction is that we did overcome largely all
> targets in terms of cash service. We save Euro 200 million EBITDA,
> we reach 300 EBITDA 100 more, and close to Euro 600 million total
> cash savings. The operations and these business achievements, I
> think that we owed them to our competitive advantages that were
> evident in'01. That: (1) the excellent quality of management; (2) the
> fact that we gain market share in about every single of our business.
> Those gains of market shares coming from [scale and scope]; (3) the
> assets mix, maximize our ability to go to digitalization for delivery on

> the mobile devices; and (4) to our global footprint minimizes of
> earnings volatility. That's the business achievement.

Messier also attempted to downplay the impairment charges as a choice of switching from French

GAAP to U.S. GAAP in order "to be even more transparent." Messier stressed the non-cash

nature of the impairment charge.

219.    As reported in the Securities Class Action Complaint, Lehman Brothers issued a

report on March 6, 2002 based, in part, on the statements made by Vivendi's management in the

March 5, 2002 conference call:

> In its post results conference call, management confirmed that the
> value adjustments to the U.S. assets . . . reflected largely a change in
> accounting treatment and did not signal a negative outlook for the
> U.S. water business.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the goodwill write-down was not attributable to a change in accounting

but, rather, to the fact that the Company had been overstating goodwill all along, as set above in

Section IV.B, *supra.*

220.    Bear Stearns issued a report on March 6, 2002, based on the March 5, 2002

conference call, stating in pertinent part as follows:

> For '02, Management reiterated their guidance of 10% organic sales
> growth for all the Media Communications businesses. Vivendi also
> expects EBITDA of close to €6 billion (pre-USA Networks and pre-
> Stream). . . .
>
> A list of ten accounting 'issues' relating to off-balance sheet
> financing was published in conjunction with the results and the group
> is today holding an accounting workshop to clarify the impact of
> moving to U.S. GAAP when it reports Q1'02 results this year.

*    *    *

99

> The company disclosed that the €19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR.

The statements made by Vivendi management contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that they expected to reach the reported goals by employing fraudulent accounting, as discussed above in Section IV.B, *supra*, and by continuing to conceal to Company's liquidity crisis, as discussed above in Section IV.C, *supra*.

221.   On April 4, 2002, Messier filed another shareholder newsletter on Form 6-K (the April 4, 2002 6-K"). In it, he confirmed that "Vivendi Universal has met its targets in 2001." He went on to state:

> Our media and communications businesses posted EBITDA . . . of 5 billion euros (a 34% pro forma growth), and operating income of 1.8 billion euros (an 89% pro forma growth) and operating free cash flow of 2 billion euros, which is above projections. These results were achieved with a 10% pro forma revenue growth to 28.9 billion euros. If we include our subsidiary Vivendi Environnement, total pro forma revenues amount to 58.2 billion euros.
>
> Our business in media and communications have improved their performance, with strong EBITDA growth for Cegetel, TV and Film . . ., and Vivendi Universal Publishing. . . .
>
> Achieving these results during the general economic downturn of recent months was no easy task. But it is in tough situations like this that we can demonstrate our capacity. The proof is there, thanks to the quality of our teams and our products.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was able to meet its target and posts the results reported only by

employing fraudulent accounting, as discussed above in Section IV.B, *supra*, and by continuing

to conceal to Company's liquidity crisis, as discussed above in Section IV.C, *supra*.

222.    When addressing the reported accounting losses of €13.6 billion, Messier pointed

out that "this loss results from a write-down of the value of certain assets taken purely for

accounting purposes. There is no actual cash disbursement." He went on to blame the losses on

"our anticipated application of U.S. GAAP," stating:

> The change involves several technical modifications, the most significant being the re-evaluation of acquired assets at current market values. Taking into account the stock market decline, the following companies have been reduced on our balance sheet. The value of Canal+ is reduced by 6 billion euros, that of Universal Music by 3.1 billion euros, and the value of USG (studios) and Vivendi Telecom International by 1.3 billion euros each. I would like to repeat this move does not represent any operating loss – it is an accounting loss that has no cash impact whatsoever.

> By making this adjustment now in our financial statements . . . we are keeping one step ahead of market expectations. We are also giving ourselves the opportunity to present first quarter 2002 figures that are understandable to all investors.

> This will also enable us, in the future, to improve our net income by significantly reducing charges relating to amortization.

> These factors allow us to propose to the shareholders' meeting that the dividend for 2001 be maintained at 1 euro per share.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the goodwill write-down was not attributable to a change in accounting

but, rather, to the fact that the Company had been overstating goodwill all along, as set forth

above in Section IV.B, *supra*.

223.    On April 15, 2002, Defendants caused Vivendi to file a Form 6-K (the "April 15, 2002 6-K") containing a translation of financial information provided to the French financial regulators. In discussing the goodwill impairment of Vivendi's assets, the Form 6-K stated:

> Vivendi Universal reviews the carrying of long-lived assets, including goodwill and other intangible assets, for impairment at least annually or whenever facts, events or changes in circumstances, both internally and externally, indicate that the carrying amount may not be recoverable. Measurement of any impairment is based on fair value. In 2001, following the recent market decline, . . . our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest related to Vivendi Environnement). The charge was comprised of €6 billion for CANAL+ Group, €3.1 billion for Universal Music Group, €1.3 billion for Universal Studios Group, €1.3 billion for international Telecoms businesses, €0.6 billion for Vivendi Environnement (net of €0.3 billion minority interest) and €0.3 billion for Internet businesses. Of the total charge, €12.1 billion related to consolidated subsidiaries and €0.8 billion related to investments accounted for using the equity method.

224.    The financial statements contained in the April 15, 2002 6-K indicated that "[t]otal revenues were €57.4 billion." The revenues generated by Vivendi's "core businesses" were €57.2 billion, which was an increase of 43%. Twenty-seven percent of the revenues was due to the "inclusion of a full twelve-month results of the acquired Seagram's operations in 2001 . . . 4% resulted from the 2001 acquisitions of Maroc Telecom, Houghton Mifflin and MP3.com, and the remaining 12% was generated by a combination of organic growth and the impact of less significant acquisitions and disposals." The April 15, 2002 6-K further stated:

> Revenues generated by our Media and Communications businesses increased 107% to €28.1 billion, accounting for 49% of our total revenues compared to 33% in 2000. . . . On a pro forma basis, which includes twelve months of comparable operations both for Seagram and the above 2001 acquisitions, revenues increased 9% to €28.9 billion (10% excluding Universal Studios Group filmed entertainment). Double-digit revenue growth of 24% and 36% respectively, were generated by our Telecom and Internet businesses. Our TV & Film and Publishing businesses generated revenue growth

102

of 8% and 5%, respectively. In our Music business, revenues declined 1%, however, this was a strong performance in a down market.

Revenues generated by our Environmental Services businesses, at €29.1 billion, increased 11%, 8% of which was generated by organic growth and 3% of which was due to the implementation of the Dalkia-EDF agreement and other acquisitions. . . .

\*      \*      \*

. . . In the U.S., revenues increased 81% to €12.7 billion.

225.    In discussing Vivendi's operating income, the April 15, 2002 6-K noted that operating income had "more than" doubled to €3.8 billion, an increase of 145% in Vivendi's "core businesses." The Media and Communications businesses generated €2.2 billion in operating income "before holding and corporate expenses." The 2001 €2.2 billion operating income was an extraordinary increase from €174 million in 2000. Environnemental Services' operating income increased 24% to €2 billion.

226.    On April 24, 2002, Vivendi filed a Form 6-K (the "April 24, 2002 6-K") announcing its "strong" first quarter 2002 Media and Communications results. Vivendi reported a "strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations." The release, issued in New York and filed on a Form 6-K, further reported that "[n]et debt fell from approximately 19 billion euros to approximately 17 billion euros." The release also reported Media and Communications' "revenue organic growth of 13% to 6.8 billion euros; strong EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros." Messier commented on these results as follows:

> The hard numbers in the first quarter show that Vivendi Universal has a winning strategy, and demonstrate our commitment to excellent management and delivering operating results quarter after quarter. In the first quarter, each operating segment delivered its revenue targets, and most segments over-delivered EBITDA and operating free cash flow compared with their budgets.

\*        \*        \*

> In a difficult environment, Vivendi Universal's businesses gained market share. Cash management improved dramatically. Finally, the revenue and cost synergies achieved in the quarter were significant. Further gains will be driven by improving businesses that currently have negative operating free cash flow: Canal+ and Internet operations.

227.    On April 30, 2002, Vivendi filed a Form 6-K (the "April 30, 2002 6-K") announcing purportedly "strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to €13.2 billion. The release, issued in New York and filed on a Form 6-K, also reported that consolidated operating income grew 11% pro forma to €781 million, excluding goodwill amortization. In the release, Messier commented on the results as follows:

> The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that we have articulated to our shareholders. In the first quarter of 2002, both Media & Communications and Vivendi Environnement delivered their targets.

> The Media & Communications financial results released last week, coupled with our consolidated results issued today, are testimony to our ability and conviction to deliver strong results in operations, cash flow, EBITDA and net income. As I said last week, because of our strong performance in the quarter, we are lowering our estimate of Media & Communications year-end Debt/EBITDA ratio to less than 3x by December 31, 2002.

> In a very difficult economic environment, characterized by many market uncertainties, Vivendi Universal's global businesses gained market share. In addition, strong improvement was achieved in cash management, debt reduction, synergies, management development and revenue growth.

228.    The April 30, 2002 6-K further touted the Company's allegedly strong cash flow position:

> On a pro forma basis, excluding Vivendi Universal's publishing businesses to be disposed of (including the B-to-B and Health

104

businesses whose sale is expected to be completed in the second quarter), Media and Communications reported:

A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations;

Strong operating results in the first quarter: revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros. All were significantly ahead of budget.

229.    The April 4, 2002 6-K, the April 15, 2002 6-K, the April 24, 2002 6-K and the April 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section IV.B, *supra*), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized above in Section IV.C, *supra*) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

230.    On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3. According to Moody's, the ratings downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

231.    That same day, Vivendi issued a press release, filed on a Form 6-K, criticizing

Moody's decision and attempting to downplay its significance:

> The company believes that this decision does not fully take into
> consideration the currently poor market conditions and the fact that
> the agency does not take into account immediately the whole of the
> debt reduction program planned by Vivendi Universal.
>
> This decision has no impact on Vivendi Universal's cash situation. It
> does not trigger any renegotiation clauses or advance repayments of
> bank credit lines. In addition, Vivendi Universal's use of commercial
> paper in the current amount of 1.6 billion euros is well covered by
> back-up lines of more than 3 billion euros, the availability of which
> will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to
> meet its operating targets for 2002, as proved by its first-quarter
> results. The company is totally determined to carry through its debt
> reduction program in order to make a rapid return to a comfortable
> position with a Baa2 rating.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi's "confidence" in its ability to meet its targets for 2002 was based

on the accounting fraud discussed above in Section IV.B, *supra,* and on their continued

concealment of the Company's burgeoning liquidity crisis discussed above in Section IV.C,

*supra.*

232.    On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December

31, 2001 (the "2001 Form 20-F"). The 2001 Form 20-F reported total revenues of €57.4 billion

in 2001, which was an increase of 43% over 2000. Vivendi's Media & Communications

business's revenues increased 107% to €28.1 billion over 2000, accounting for 49% of its total

revenues. The Environmental Services businesses generated €29.1 billion, an increase of 11%

over 2000. In discussing 2001 financial results versus the 2000 results, Vivendi reported that

106

"EBITDA more than doubled to €2.3 billion and operating income almost tripled to €1.3 billion." Excluding Maroc Telecom's results, "revenue growth was 26%, EBITDA increased 56% and operating income increased 103%." In discussing 2000 financial results versus 1999 results, Defendants reported that "EBITDA grew 164% to €1.3 billion and operating income of €486 million was earned compared to an operating loss of €60 million."

233. According to the 2001 Form 20-F, Vivendi's total operating income "more than doubled to €3.8 billion." The Media & Communications businesses "generated operating income before holding and corporate expenses of €2.2 billion in 2001." Environmental Services' operating income increased 24% to €2 billion.

234. Vivendi listed its liquidity and capital resources at December 31, 2001 as follows:

> €41.8 billion of debt, €4.7 billion of cash and cash equivalents and €36.7 billion of shareholders equity compared to €38.8 billion of debt, €3.3 billion of cash and equivalents and €65.7 billion of shareholders equity at December 31, 2000.

235. The Consolidated Balance Sheet listed cash at €4.7 billion and €3.2 billion as of December 31, 2001 and December 31, 2000, respectively. Net cash provided by operating activities was presented in the Consolidated Statement of Cash Flows as being €4.5 billion and €2.5 billion as of December 31, 2001 and December 31, 2000, respectively.

236. In discussing goodwill, Defendants stated:

> Recurring goodwill amortization increased to almost €1.7 billion, primarily due to the inclusion of a full twelve-months of goodwill amortization related to the merger with Seagram and Canal+. Additionally, as previously discussed, our 2001 annual review for impairment of the carrying value of long lived-assets resulted in a non-recurring, non-cash charge of €12.9 billion to goodwill amortization. The impact of the charge on future results will be to reduce goodwill amortization by approximately €380 million per year.

237. Defendants also reported cash flow in the 2001 Form 20-F as follows:

Net Cash Flow from Operating Activities -- Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities. Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program. In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999. The significant improvement was primarily due to increased earnings generated by our Telecom, Publishing and Environmental Services businesses.

Net Cash Flow from Investing Activities -- Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000. Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB, partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion. In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999. The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

Net Cash Flow from Financing Activities -- In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included a €59 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €1.4 billion, partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999. The year-on-year variance was primarily due to the Merger Transactions. In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €03.8 billion.

238.    In discussing the Maroc and Cegetel consolidation in Footnote 11 to the

Consolidated Financial Statements, Defendants reported:

> [Cegetel and Maroc are] consolidated because, through a
> shareholders' agreement, Vivendi Universal has a majority of the
> shareholder voting rights and no other shareholder or groups of
> shareholders exercise substantive participating rights, which would
> allow them to veto or block decisions taken by Vivendi Universal.

239.    In reporting on its investment into Elektrim SA, Defendants disclosed only that

Vivendi had entered into an Investment Agreement with Elektrim SA, acquiring 49% of

Elektrim.  It further stated:

> In March 2002, Vivendi Universal announced that it had signed a
> non-binding Memorandum of Understanding with a group financial
> investors led by Citigroup Investments to sell its 49% interest in
> Elektrim Telekomunikacja. As part of the agreement, Vivendi
> Universal will retain a minority interest in the Citigroup-led
> consortium and will be granted a put option and the investors a call
> option on this interest. The exercise of the two options will ensure
> that Vivendi Universal is able to completely withdraw from its
> investment in Elektrim Telekomunikacja in due course

240.    In discussing Vivendi's accounting policies, Defendants again stated that Vivendi

recognized revenues from the sale of recorded music, "net of a provision for estimated returns

and allowances, . . . upon shipment to third parties" and recognized revenues in Environnemental

Services when services were provided, stating:

> Amounts billed and collected prior to services being performed are
> included in deferred revenues. Fees incurred to obtain a contract and
> paid upfront are capitalized and amortized on a straight-line basis
> over the duration of the contract. Revenues from long-term contracts
> involving a substantial construction component are recorded on the
> percentage-of-completion basis.

241.    For the reasons set forth in greater detail above in Section IV.B, *supra*, Vivendi's

historical financial statements and balance sheets contained in Vivendi's 2001 Form 20-F

contained untrue statements of material fact and omitted to state material facts required therein or

109

necessary to make the statements therein not misleading because, *inter alia*, the Company (a)

failed to report pro forma financial results properly, improperly consolidated into its financials

revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership); (b)

failed timely to write down impaired goodwill from previous corporate investments and

acquisitions, including Canal+; (c) overstated the Company's revenue from its Environnemental

division on certain multi-year contracts in violation of GAAP; and (d) failed to adhere to the

accounting policies described in its SEC filings. In addition, the 2001 Form 20-F contained

untrue statements of material fact and omitted to state material facts required therein or necessary

to make the statements therein not misleading because Defendants failed to disclose that Vivendi

was suffering from a liquidity crisis, as set forth above in Section IV.C, *supra*.

242.    Defendants further attempted to address concerns about debt levels by issuing a

press release on May 30, 2002, subsequently filed on a Form 6-K (collectively, the "May 30,

2002 6-K"). The May 30, 2002 6-K disclosed that Vivendi had negotiated some debt relief by

obtaining an "agreement from the banks to delete the clauses that linked the availability of credit

lines to a rating level." This action decoupled Vivendi's bank credit lines from rating agencies'

decisions. Investors were further reassured that "the Company has no reason to anticipate or fear

any further deterioration in its credit rating." The May 30, 2002 6-K further stated:

> Vivendi Universal has also confirmed that, after payment of the
> dividend and the acquisition of USA Networks, its available credit
> lines that have not been used to date amount to almost 3.5 billion
> euros. Also, its use of commercial paper is limited to about 1 billion
> euros, and the reimbursement of expected debts during the coming
> months is limited.
>
> This cash situation, which, the Company believes, is comfortable –
> even assuming an extremely pessimistic market – will enable the
> Company to continue its debt reduction program with confidence and
> with a view to creating the best possible value for its shareholders.

243.    The May 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was facing a liquidity crisis, as discussed above in Section IV.C, *supra*. Unbeknownst to investors, Vivendi's cash situation was dire and a further deterioration in its credit rating was all but certain. Defendants were offering false reassurances that had their intended effect – on May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

244.    On June 11, 2002, Defendants caused Vivendi to file a Form 6-K (the "June 11, 2002 6-K") containing Vivendi's first quarter 2002 unaudited consolidated financial results reporting numbers in line with its April 30, 2002 6-K, as set forth above.

245.    The statements contained in the June 11, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading for the same reasons the statements in the April 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Section IV.B, *supra*.

246.    Defendants continued their efforts to counteract the stream of bad news. On June 25, 2002, Vivendi issued a press release (and filed a Form 6-K) (collectively, the "June 25, 2002 6-K") titled "Vivendi Universal to Lower Debt by €4 billion in 2002," reiterating the positive steps it had taken to reduce debt and announcing that the Company's cash position was not precarious.

247.    The statement in the June 25, 2002 6-K that the Company's cash position was not precarious contained untrue statements of material fact and omitted to state material facts

111

required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth above in Section IV.C, *supra*.

248.    On June 26, 2002, Vivendi issued yet another press release and Form 6-K (collectively, the "June 26, 2002 6-K") outlining additional details about Vivendi's "deleveraging and liquidity." The June 26, 2002 6-K first outlined that "[a]ccording to the U.S. definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi Environnement) fell from around €19 billion at December 31, 2001 to approximately €17 billion at March 31, 2002, (and from €14.6 billion to €12.9 billion under French GAAP)." The June 26, 2002 6-K stated that "[t]he main factors that will impact debt under U.S. practices in the second quarter were or will be [cash inflows and cash outflows]."

249.    Further, the June 26, 2002 6-K stated that Vivendi's new debt target was €15 billion by December 31, 2002, stating that "[t]his target represents a ratio of debt to estimated 2002 EBITDA of below 2.5 times, including Cegetel and Maroc Telecom, as is required by both U.S. and French accounting standards. Using 'proportional' levels of estimated 2002 EBITDA and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times EBITDA." According to the press release, the lowered debt target, "which is lower than that so far announced, has been made possible by the rapid progress made in the debt-reduction plan during the first half of the year."

250.    The June 26, 2002 6-K also lauded Vivendi's high levels of available credit, stating that "[a]t this point in time, Vivendi Universal has available around €3.3 billion in unused credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion." This 6-K extolled Vivendi's strong free cash flow, stating:

> Owing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months.

251.    According to the June 26, 2002 6-K, to aid its cash situation, Vivendi had also "renegotiated a number of bank clauses, in particular those that placed it in the situation of certain loans being called if its credit ratings fell below [a certain level]."

252.    The June 26, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth above in Section IV.C, *supra*.

253.    On June 26, 2002, Messier discussed the Company's debt and liquidity during an investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors in the current environment relating to views, view for yourselves, views for your accounting and I seen that in those circumstance. The best that we can do is to show you that's [sic] there is no hidden liability that's you have all the information to come back.

Messier's statement that there was no "hidden liability" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed above in Section IV.B, *supra*, and that it was facing a liquidity crisis, as set forth above in Section IV.C, *supra*.

254.    As stated in the Securities Class Action Complaint, on June 26, 2002 the Dow Jones International News reported:

> Chairman Jean-Marie Messier said late Wednesday that he plans to stay in charge of the embattled media company despite criticism of his strategy and a crumbling share price.

> Messier sought to counter those doubts, opening the call with a comment that the company has no hidden, off-balance sheet liabilities and adding, "we feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months."

Messier's statement that there was no "hidden liability" contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed above in Section IV.B, *supra*, and that it was facing a liquidity crisis, as discussed above in Section IV.C, *supra*.

255.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default. On July 2, 2002, Bloomberg reported that Messier "told employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting." Messier's statement that there were no hidden risks in the company's accounting contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed above in Section IV.B, *supra*, and that it was facing a liquidity crisis, as discussed above in Section IV.C, *supra*.

256.    According to the Norges Bank Action, the next day, July 3, 2002, *The Columbian* reported that Messier continued to defend Vivendi's financial statements: "There are no underestimated liabilities. There are no overvalued assets," Messier said. "Our results are true, genuine and complete."

257.    Messier's contention that the Company's results were "true, genuine and complete" contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed above in Section IV.B, *supra*, and that it was facing a liquidity crisis, as discussed above in Section IV.C, *supra*.

## VI.    DEFENDANTS' SCIENTER

258.    Throughout the Relevant Period, Defendants intentionally, or at the very least recklessly, made materially false and misleading statements and concealed material information regarding Vivendi's financial condition, as alleged herein. Many of the misstatements and omissions were the result of intentional deception and intentional violations of GAAP by these Defendants, for the purposes of boosting Vivendi's ordinary share and ADS prices.

259.    As set forth elsewhere herein in detail, Messier and Hannezo, by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's materially misleading statements, financial statements and/or their associations with the Company that made them privy to confidential proprietary information concerning Vivendi, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the market and to Plaintiff.

260.    Vivendi is charged with the knowledge possessed by its senior officers, including Messier and Hannezo.

261.    Messier's and Hannezo's intentional misconduct included, *inter alia*, authoring and enforcing improper accounting practices and demanding that Vivendi's employees misapply GAAP in order to mask the true liquidity and cash flow situation that Vivendi was suffering.

262.    During the Relevant Period, Messier and Hannezo signed Vivendi's Forms 20-F, Annual Reports and/or Forms 6-K with knowledge that they falsely represented Vivendi's financial results, or with reckless disregard for their truth or falsity.

263.    By mid-December 2001, Defendants knew that Vivendi had just narrowly avoided a downgrade in its investment status by the credit rating agencies that, had it happened, would have nearly eliminated Vivendi's cash and would have deleteriously impacted the Company's ability to borrow more funds from its credit facilities for further acquisitions.  In fact, it was that near downgrade that gave Hannezo the "unpleasant feeling of being in a car whose driver is accelerating in the turns" with him in the "death seat," and led him to implore Messier that "all of this not end in shame."  Nevertheless, Messier chose to not mention the narrowly-averted credit rating downgrade when urging Vivendi's Board of Directors to approve the $10 billion acquisition of USA Network's television and film business just two days later, and both he and Hannezo continued to sign off on Vivendi's false disclosures about, *inter alia*, its cash and liquidity situation.

264.    Further, as alleged above in Section IV.B, *supra*, Hannezo knew from a memo dated January 29, 2001, prepared shortly after Vivendi acquired Canal+, that the football marketing rights that originally had been believed to be an asset of Canal+ actually belonged to the football league.  Hannezo knew or should have known, but recklessly disregarded, the fact that Vivendi took no impairment charge in fiscal 2001, resulting in Vivendi overstating the value of its subsidiary.

265.    Additional evidence of Defendants' scienter is the fact that, even though Vivendi claimed in its March 5, 2002 earnings release that, based on the company's "excellent" operating results, it would pay a €1 per share dividend, Vivendi had had to borrow against credit facilities

to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends. Similarly, despite stating in Vivendi's June 26, 2002 press release that the Company had "around €3.3 billion in unused credit lines to back up its commercial paper outstanding of nearly €1 billion" and that the cash situation had greatly improved since the beginning of the year, just one day before Vivendi issued that press release, at least €900 million of the €3.3 billion in Vivendi credit lines had expired, and Vivendi's cash situation had in fact worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

266.    The magnitude of the impact of Defendants' fraud also strongly evidences Defendants' intentional or reckless conduct. As set forth above, the revelation of Vivendi's truly dismal liquidity situation – including a €19 billion debt burden – caused it to teeter on the edge of bankruptcy, dried up its credit lines, caused its credit ratings to crumble, triggered its credit facility covenants' ratings thresholds, and led its lenders to refuse to extend to Vivendi sorely needed fresh credit. Vivendi itself admitted that it faced having to reduce its debt by billions of euros in order to achieve an acceptable capital structure. This cash and liquidity crisis did not happen overnight but, rather, was the direct result of Defendants' deliberate, steady collision course driven by their insatiable appetite for more acquisitions and the attendant prestige, power and money that would inure to them as the world's leading media and entertainment group. The extent of the crippling debt load, that Vivendi only first started to publicly admit it was bearing in July 2002, directly belied the financial picture that Defendants presented to the securities markets during the Relevant Period.

267.    Defendants' scienter is further evidenced by the fact that, commencing immediately on the heels of the disclosure that the Company's viability going forward was

threatened absent a fire sale of its assets, new management rapidly downsized the Company, sold off major assets and restructured it, as alleged above in Section IV.D. Those actions demonstrate the extent of the bloat, waste and excess caused by Defendants' hunger for a global empire that they built by means of a fraudulent scheme that misled investors about Vivendi's financial condition, cash and cash flow positions, and liquidity situation. *See* Sections IV.B and IV.C, *supra.*

268.    In the arbitration proceedings brought by Messier to enforce the terms of his termination agreement with Vivendi, Vivendi itself stated that Messier caused Vivendi's near collapse. In addition, as reported by the Associated Press on December 12, 2002, Hannezo admitted that "2001 was marked by a series of errors, including underestimating the debt problem." Further, Vivendi's new CEO also admitted at a French parliamentary hearing in September 2002 that had Messier remained CEO of Vivendi beyond July 3, 2002, Vivendi invariably would have gone bankrupt "within 10 days."

269.    The criminal, civil and regulatory authorities in the United States and in France (including the SEC, the United States Attorney's Office, public prosecutors in Paris and the COB) that investigated and/or commenced proceedings against Defendants all focused on the same question: whether Vivendi, Messier, Hannezo and other Vivendi executives misled investors with overly rosy assessments of the Company's financial health. As a result of its investigation, the SEC found that Vivendi, Messier and Hannezo violated the federal securities laws, including Section 10(b) of the Exchange Act. The COB concluded that Vivendi had committed irregularities in its financial disclosures and fined Vivendi and Messier €1 million each for making misleading financial disclosures between 2000 and 2002.

270.    Messier and Hannezo had the motive and opportunity to commit fraud because they had the means and the likely prospect of achieving concrete benefits from their fraudulent conduct.  Messier wanted Vivendi to be a worldwide empire and Vivendi was on an unrelenting quest to maintain and expand its enterprise.  In total, Vivendi spent over $75 billion in pursuit of Messier's ambition to create the world's number-one entertainment company through rapid acquisitions of companies in the United States and abroad, using Vivendi's securities as consideration.  Defendants achieved that objective by artificially maintaining the value of Vivendi's ordinary shares and ADSs and by propping up their price through the dissemination of the materially false and misleading statements described in detail above.  In addition, Vivendi's ability to maintain positive credit ratings and thereby to obtain additional financing for further acquisitions depended on Defendants' fraudulent scheme.  Vivendi's global reach could not have been achieved *without* Defendants' fraudulent inflation of Vivendi's share price.

271.    Messier had an even greater motive for inflating the appearance of Vivendi's financial performance from which he derived concrete benefit by virtue of his fraudulent conduct: his bonus was pegged to Vivendi achieving specific earnings targets.  Messier's compensation included a base salary, plus lucrative bonuses based on earnings results, stock options and other perks such as a personal assistant, security guards and the use of a $17 million Park Avenue penthouse at below market rate.  As reported in Vivendi's Form 20-F for fiscal year ended December 31, 2001, Messier received 835,000 stock options and earned $4.8 million in compensation.  Of that amount, more than $3 million – two-and-a-half times his salary – comprised his bonus, which he received because Vivendi's EBITDA had increased that year by more than 30%.  Had Vivendi's earnings increased by more than 35%, Messier would have received three times his base salary as a bonus.  Hannezo likewise received extremely lucrative

compensation and remuneration that was dependent upon the Company's achievement of certain financial targets. By manipulating the Company's accounting to create the illusion that those targets had been achieved, Messier and Hannezo created an entitlement to bonuses they would not have received if the Company's financial results had been accurately reported.

272.    As CEO, Messier was the public voice of Vivendi and was therefore in a position to communicate, as he did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP and the veracity of its financials. Messier signed or authorized all of the Company's SEC filings, Annual Reports and press releases during the Relevant Period. Hannezo signed many of the Company's SEC filings and Annual Reports, as alleged herein. Further, Hannezo oversaw the Company's accounting and financial reporting, was responsible for creating and approving accounting policies and procedures, and was directly involved in the preparation of the Company's financial statements. Thus, Messier and Hannezo had the ability to control the Company's accounting as well as the content of its financial statements and disclosures. Both had the motive and the opportunity, which they took, to commit fraud.

273.    Vivendi had an obvious opportunity to commit fraud, because it published and controlled the content of its own financial statements and other public statements, and because it controlled its own accounting and financial reporting functions, by which the fraud was perpetrated.

274.    Messier's and Hannezo's scienter is further evidenced by their clandestine insider trading during the Relevant Period. According to an article in *The Wall Street Journal* dated January 24, 2003, Messier and Hannezo (and other senior executives of Vivendi that were part of Messier's "dream team") exercised options and sold stock days before an abrupt, huge share

120

placement in the first weeks of 2002 by Vivendi that Messier had arranged to raise desperately need cash. That transaction sent Vivendi's ordinary share and ADS price crashing. Specifically, as reported by *The Wall Street Journal*, on or about December 28, 2001, just days after writing the "death seat" memo and before the stock sale transaction, Hannezo exercised stock options that earned him a profit of €1.3 million or $1.4 million. An April 11, 2003 article in *The Wall Street Journal* reported that Vivendi acknowledged that Messier also sold 152,000 shares on December 21, 2001 and 106,669 shares on December 27, 2001. In addition, Agnes Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of Vivendi's communications department, also exercised stock options at or around the same time. Shortly thereafter, on or about January 7, 2002, Vivendi unexpectedly sold 55 million shares of treasury stock in a €3.3 billion deal. Given their top roles at the Company, Messier and Hannezo and these other executives knew or were in a position to know about that transaction. The market reaction to the sale caused the Company's share price to tumble, but not before Messier, Hannezo had the chance to exercise stock options at a profit. It was not until April 2003 when Messier admitted for the first time that in late 2001 he had sold a huge number of Vivendi shares, worth at least €15 million.

## VII.    LOSS CAUSATION

275.    At all times relevant hereto, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by Plaintiff. As described herein, during the Relevant Period, Defendants made or caused to be made a series of materially false or misleading statements about Vivendi's business, prospects, operations and financial condition. These material misstatements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of Vivendi and its business,

.

121

prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all times relevant hereto. Defendants' materially false and misleading statements during the Relevant Period resulted in Plaintiff purchasing or otherwise acquiring the Company's securities at artificially inflated prices. But for Defendants' misrepresentations and fraudulent acts, Plaintiff would not have purchased Vivendi securities, or would not have purchased them at the artificially inflated prices at which they were trading during the Relevant Period. As the truth about Vivendi's actual business, prospects, operations and financial condition was revealed, the inflation caused by these misrepresentations was eliminated from the price of Vivendi's securities, thus causing damages to Plaintiff.

276.    As stated above, Vivendi's stock price began to drop starting on May 3, 2002. On that date, Moody's lowered the Company's long-term debt rating to just one notch above "junk" status, citing concerns about the Company's debt load. Despite Defendants' attempt to reassure the market that Moody's was wrong, in response to Moody's rating downgrade, on May 3, 2002, the Company's ADSs dropped $1.60 down from its close of $30.67 on May 2, 2002 to a close of $29.07 on May 3, 2002. The Company's ordinary shares suffered similar declines, dropping from €33.77 on May 2, 2002 to €31.52 on May 3, 2002.

277.    Vivendi's stock continued to plunge as the market learned of the potentially devastating effects subsequent credit downgrades could have on the Company. Notably, following May 6, 2002 press accounts revealing that Vivendi could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip any further, the Company's ADSs dropped another $0.81 to a closing price on May 6, 2002 of $28.26, while its ordinary shares dropped another €0.52 to a closing price on May 6, 2002 of €31.

278.    On July 2, 2002, Vivendi's debt was downgraded for a second time. This announcement caused Vivendi's ADSs to plummet nearly 21%, falling from a closing price on July 1, 2002 of $22.45 to a closing price on July 2, 2002 of $17.76, while its ordinary shares fell more than 25%, from its closing price on July 1, 2002 of €23.90 to a closing price on July 2, 2002 of €17.80. The Company's shares plunged so fast that the Paris Bourse temporarily suspended trading in Vivendi's ordinary shares.

279.    The following day, Vivendi finally disclosed to the public that the Company was facing a "short-term liquidity issue" and ousted Messier. Vivendi disclosed that it would be required to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7 billion by the end of 2002 – an amount they feared could expand to €5.5 billion by the middle of 2003 if the Company failed quickly to secure new multibillion euro lines of credit. These announcements caused the Company's ADSs and ordinary shares to fall even further, dropping nearly another 12% from its July 2, 2002 close of $17.76 to a July 3, 2002 closing price of $15.66 and nearly another 22% from its July 2, 2002 close of €17.80 to a July 3, 2002 close of €13.90, respectively. In total, the Company's ADSs and ordinary shares fell a stunning 30% and 41.8%, respectively, in the two days following the second credit rating downgrade.

280.    On July 10, 2002, *The Wall Street Journal* reported that the COB had raided Vivendi's Paris headquarters as part of a formal investigation into the Company's financial disclosures going back to 2001. Notably, the French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and

123

December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

281.    Unfortunately for Vivendi's investors, the stunning collapses of early July 2002 only foreshadowed drops still to come. On August 14, 2002, Vivendi announced that it had suffered €12 billion net loss for the first half of 2002 and that it would take a further €11 billion goodwill write down for depreciated assets. Following this announcement, Standard & Poor's dropped Vivendi's debt to junk status. Vivendi's ADSs and ordinary shares cratered, dropping a stunning 23.9% and 25.2%, respectively – falling from $15.33 to $11.66 and from €15.90 to €11.89, respectively – in a single day.

282.    Between July 2, 2002 and August 14, 2002, Vivendi lost a stunning €6.4 billion in market capitalization.

283.    All told, Messier's more than $75 billion acquisition spree caused investors in the Company's ADSs to suffer a staggering 85% decline from their Relevant Period high of $75.50 and investors in its ordinary shares to suffer an equally stunning 83.9% decline from their Relevant Period high of €86.50.

## VIII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

284.    The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to the allegedly false statements pleaded herein as many of the statements were of historical facts or existing conditions and not identified as forward-looking statements. To the extent certain statements pleaded herein were forward looking, they were not accompanied by specifically tailored, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the forward looking statement. To the extent that the statutory safe harbor would otherwise apply to any statement pleaded,

124

Defendants are liable for those false forward looking statements because at the time each of those statements was made the speaker actually knew the statement was false.

## IX.    PRESUMPTION OF RELIANCE

285.    In connection with its claims arising under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and the common law, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine as the securities purchased by Plaintiff traded in an open and efficient market.

286.    As set forth above, Defendants made material misrepresentations or failed to disclose material facts. These misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company's securities. Plaintiff purchased the Company's securities between the time when Defendants misrepresented material facts and the time the true facts were disclosed.

287.    The Company's ordinary shares are listed and trade on the Paris Bourse and its ADSs were listed and traded on the NYSE during the Relevant Period, both of which are highly efficient markets.

288.    As regulated issuers, Vivendi filed periodic reports with the SEC and other regulators. In addition, Vivendi was followed by securities analysts who wrote reports that were disseminated to the public. Further, Vivendi issued press releases that were carried by national and international newswires and thus were publicly available and entered the public marketplace.

289.    As a result, the market for Vivendi securities promptly digested current information from all publicly-available sources and reflected such information in the price of Vivendi's securities. Under these circumstances, all purchasers of Vivendi's securities suffered

similar injury through their purchases of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## X.    TOLLING OF THE STATUTE OF LIMITATIONS

290.    Plaintiff did not know, and could not reasonably have discovered before, at the earliest, July 2, 2002 that Vivendi's financial statements and Defendants' other public statements regarding the Company's financial condition were materially false and misleading.  On that date, Vivendi's debt, which had been downgraded to one level above "junk" status on May 3, 2002, was downgraded for a second time, causing the stock to drop 25% to a new 15-year low of €17.80.  Following his July 3, 2002 ouster, Messier continued to deny any wrongdoing, steadfastly maintaining that the Company's financial results were all "true, genuine and complete."

291.    These attempts to reassure the market, however, would ultimately prove futile. On August 14, 2002, Vivendi was at long last forced to reveal its financial woes, announcing that it had suffered a massive $12 billion loss in the first half of 2002 and that it would have to sell $10 billion in assets to reduce its debt.  Fourtou, Messier's successor, flatly admitted, "We are facing a liquidity problem."

292.    Prior to, at the earliest July 2, 2002, the statutes of limitations on Plaintiff's claims were tolled by Defendants' active and continuing concealment of the falsity of their statements. Further, the statutes of limitations on Plaintiff's claims were again tolled beginning on July 18, 2002, due to the filing of a securities class action complaint on that date in *Rosenbaum Partners, L.P. v. Vivendi Universal,* No. 02 Civ. 5571 (now pending as the Securities Class Action). Plaintiff was a member of the putative class in that action, which asserts claims against Vivendi

126

and Messier pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the Exchange Act. Those claims arise out of the same facts and circumstances as the claims in this Complaint.

293.    By Order entered March 26, 2007, the Court ruled on the class plaintiffs' motion for class certification in the Securities Class Action. The Court certified a class of all purchases of Vivendi securities located in United States, England, France and The Netherlands. Accordingly, the statutes of limitations on Plaintiff's claims remained tolled between at least July 18, 2002 and March 26, 2007.

294.    All of Plaintiff's claims have been brought within the applicable statutes of limitations, after giving effect to tolling and the relation-back doctrine.

## XI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of Section 11 of the Securities Act
### (Against All Defendants)

295.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. In particular, Plaintiff does not repeat and reallege herein any facts that are unnecessary or irrelevant for purposes of stating a claims under Section 11 of the Securities Act, 15 U.S.C. § 77k, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence, and Plaintiff expressly disclaims any claim of fraud or intentional misconduct with regard to this first claim for relief.

296.    This claim is brought against all Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k.

297.    Vivendi issued ordinary shares pursuant to the registration statement contained in the Form F-4 for the Merger Transactions (hereinafter, the "Registration Statement"). All purchases of Vivendi ordinary shares are traceable to the Registration Statement.

298.    The Registration Statement contained untrue statements of material fact including, but not limited to, the financial statements of Vivendi and other statements regarding Vivendi's business operation and financial results. In addition, the Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including the true cash and liquidity situation that existed at Vivendi at the time the Registration Statement was issued and the GAAP violations described herein. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

299.    Vivendi issued stock pursuant to the Registration Statement, which Messier and Hannezo signed, and, accordingly, Defendants are strictly liable for the untrue statements of material fact and omissions to state material facts therein.

300.    Defendants owed Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

301.    As alleged in detail herein, Defendants did not make a reasonable investigation of the statements contained in the Registration Statement, and did not possess reasonable grounds to believe that the Registration Statement did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary to make the statements therein not misleading.

128

302.    Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untrue statements of material fact or omissions of material fact in the Registration Statement when it purchased or acquired Vivendi's ordinary shares.

303.    By reason of the foregoing, Defendants are liable to Plaintiff for violations of Section 11 of the Securities Act.

## SECOND CLAIM FOR RELIEF
### Violations of Section 12(a)(2) of the Securities Act
### (Against All Defendants)

304.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claims under Section 12(a) of the Securities Act, 15 U.S.C. § 77l(a)(2), including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence, and Plaintiff expressly disclaims any claim of fraud or intentional misconduct with regard to this second claim for relief.

305.    This claim is brought against all Defendants pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

306.    Defendants offered to sell, and did sell, in a public offering Vivendi's ordinary shares by means of the merger prospectus contained within the Form F-4 for the Merger Transactions (hereinafter, the "Merger Prospectus"). As alleged in detail herein, the Merger Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading. The untrue statements of material fact in the Merger Prospectus included, but were not limited to, the financial statements of Vivendi and other statements regarding Vivendi's business operation and financial results. In addition, the

129

Merger Prospectus omitted to state material facts necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading, including the Company's cash and liquidity situation at the time of the Merger Transactions. The facts misstated and omitted would have been material to a reasonable person reviewing the Merger Prospectus.

307.    Defendants owed to the purchasers of Vivendi shares, including Plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the Merger Prospectus to ensure that it was true and that there was no omission to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

308.    As alleged in detail herein, Defendants did not make a reasonable and diligent investigation and did not possess reasonable grounds to believe that the Merger Prospectus did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

309.    Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Merger Prospectus at the time it acquired Vivendi shares.

310.    By reason of the foregoing, Defendants are liable to Plaintiff, which has been damaged thereby, for violations of Section 12(a)(2) of the Securities Act.

311.    Plaintiff hereby tenders shares of Vivendi securities to Defendants and seeks rescission of its purchases to the extent that it continues to own such securities.

### THIRD CLAIM FOR RELIEF
### Violations of Section 15 of the Securities Act
### (Against Defendants Messier and Hannezo)

312.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claims under Section 15 of the Securities Act, 15 U.S.C. § 77o, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence, and Plaintiff expressly disclaims any claim of fraud or intentional misconduct with regard to this third claim for relief.

313.    This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Messier and Hannezo on behalf of Plaintiff for damages it suffered in connection with its purchases or acquisitions of Vivendi ordinary shares or ADSs that were issued in or traceable to the Merger.

314.    As alleged in detail herein, Vivendi violated Section 11 of the Securities Act with respect to the Merger Transactions by an issuing a Registration Statement that included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

315.    As alleged in detail herein, Vivendi violated Section 12(a)(2) of the Securities Act by soliciting Plaintiff's purchases of Vivendi's ordinary shares by means of the Merger Prospectus, which included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.  In soliciting these purchases, Vivendi was motivated by its own financial interests.  Vivendi failed to exercise reasonable care regarding the accuracy and

131

completeness of the Merger Prospectus. The facts misstated and omitted would have been material to a reasonable person reviewing the Merger Prospectus.

316.    Vivendi had a duty to disseminate accurate and truthful information with respect to Vivendi's financial condition and results of operations.

317.    Messier and Hannezo were control persons of Vivendi when the Registration Statement was filed and became effective and the Merger Prospectus was disseminated (among other reasons alleged herein) due to their positions, respectively, as CEO and Chairman, and CFO of Vivendi; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Registration Statement and Merger Prospectus. Because of their positions of control and authority over Vivendi, Messier and Hannezo were able to, and did, control the contents of the Registration Statement and the Merger Prospectus.

318.    By virtue of the foregoing, Messier and Hannezo both had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi, including the content of its financial statements and of the Registration Statement and the Merger Prospectus.

319.    Plaintiff purchased Vivendi ordinary shares issued in or traceable to the Merger and was damaged thereby. The Merger was conducted pursuant to the Registration Statement and the Merger Prospectus.

320.    Messier and Hannezo acted negligently and without reasonable care regarding the accuracy of the information contained in the Registration Statement and the Merger Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

321.   Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the Registration Statement and the Merger Prospectus.

322.   Plaintiff has sustained damages as a result of the inaccurate statements and omissions in the Registration Statement and the Merger Prospectus, for which it is entitled to compensation.

**FOURTH CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

323.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein. This cause of action is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

324.   During the Relevant Period, Defendants made and disseminated numerous false and misleading statements that were directly attributable to them. Defendants were provided with or had unlimited access to copies of the Company's financial statements, internal reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to, but did not, prevent the issuance of the statements or cause the statements to be corrected.

325.   As described above, Defendants carried out a fraudulent scheme and course of conduct and/or business that was intended to and did as alleged herein: (i) deceive Plaintiff; (ii) artificially inflate and maintain the market price of Vivendi securities; and (iii) cause Plaintiff to purchase Vivendi securities at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein, which operated as fraud and deceit upon Plaintiff as a purchaser of Vivendi securities.

133

326.    As alleged above, Defendants acted with scienter in that they knew or were reckless in not knowing that Vivendi's press releases, public statements reported in news articles, investor conferences and analyst reports, Annual Reports, Forms 20-F, Forms 6-K, Registration Statement and other documents filed with the SEC or COB during the Relevant Period referenced above, as well as Defendants' own public statements set forth herein, were materially false and misleading as detailed above; knew that such statements or documents would be issued or disseminated to the investing public, including Plaintiff; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as primary violators of federal securities laws.

327.    As a direct and proximate result of Defendants' wrongful conduct in violation of Section 10(b) and Rule 10b-5, the market prices of Vivendi ordinary shares and ADSs purchased by Plaintiff were artificially inflated. In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market, Plaintiff purchased Vivendi securities at artificially inflated prices.

328.    Had Plaintiff known the truth concerning the misrepresented and omitted facts described above, it either would not have purchased or otherwise acquired Vivendi securities at all, or would have done so only at substantially lower prices.

329.    Plaintiff was substantially damaged as a result of its purchases of Vivendi securities at artificially inflated prices and the subsequent decline in price of those securities when the fraud was disclosed.

### FIFTH CLAIM FOR RELIEF
#### Violation of Section 20(a) of the Exchange Act
#### (Against Defendants Messier and Hannezo)

330.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein. This claim for relief is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants.

331.    The Individual Defendants, by reason of their executive positions; their direct involvement in the day-to-day operations of Vivendi, including its financial reporting and accounting functions; their signatures on and participation in the preparation and dissemination of Vivendi's false financial statements; their false and misleading press releases and other public statements; and their direction of the Company's employees to engage in fraudulent accounting practices that caused the Company's financial statements to be false and misleading, were control persons of Vivendi. As such, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

332.    As set forth above, Vivendi participated in a fraudulent scheme and course of business or conduct, and issued false and misleading statements as a primary violator of Section 10(b) of the Exchange Act and subsections (a), (b), and (c) of Rule 10b-5 promulgated thereunder. By virtue of their positions as control persons of Vivendi and their culpable participation in the Company's fraud, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to the same extent as Vivendi for its primary violations of Sections 10(b) and Rule 10b-5.

333.    As a direct and proximate result of Vivendi's primary violations of the Exchange Act, for which the Individual Defendants are liable pursuant to Section 20(a), Plaintiff suffered substantial damages in connection with its purchases of the Company's securities during the Relevant Period.

### SIXTH CLAIM FOR RELIEF
### Common Law Fraud
### (Against All Defendants)

334.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

335.    Plaintiff asserts this cause of action against all Defendants based on common law principles of fraud.

336.    As alleged herein, each Defendant made material misrepresentations, or failed to disclose material facts, to Plaintiff regarding Vivendi's financial condition.

337.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth above, or acted with reckless disregard for the truth of those representations in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Vivendi's true financial condition and future business prospects from Plaintiff and supporting the artificially inflated price of the Company's securities.  As demonstrated by Defendants' misstatements of Vivendi's cash and liquidity positions during the Relevant Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

136

338.    The aforesaid misrepresentations and omissions were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiff when making investment decisions.

339.    The aforesaid misrepresentations and omissions constitute fraud and deceit under applicable law.

340.    Plaintiff reasonably relied upon Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities. Plaintiff or its agents read the Company's press releases, filings on Forms 20-F, and filings of Forms 6-K, including the financial statements contained therein. Plaintiff relied on those statements as being materially complete, and as not omitting material information. In particular, Plaintiff or its agents read and relied on the line items in the Company's financial statements for cash, liquidity and earnings per share. Plaintiff's decisions to purchase and hold Vivendi ADSs and ordinary shares were based, in significant part, on Plaintiff's analysis of these financial metrics as set forth in the Company's financial statements.

341.    At the time Vivendi's securities were purchased and held by Plaintiff, Plaintiff did not know of the false and/or misleading statements and omissions. If Plaintiff had known the true facts, it either would not have purchased Vivendi's securities or would have done so only at substantially lower prices.

342.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiff suffered damages in connection with its purchases and holding of Vivendi's securities.

### SEVENTH CLAIM FOR RELIEF
### Common Law Negligent Misrepresentation
### (Against All Defendants)

343.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or

137

irrelevant for purposes of stating a claim under the common law of negligent misrepresentation, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence, and Plaintiff expressly disclaims any claim of fraud or intentional misconduct with regard to this seventh claim for relief.

344.    This claim is brought by Plaintiff against all Defendants under common law principles of negligence.

345.    Defendants made materially false and misleading statements, as set forth above, regarding, *inter alia*, the financial condition and the accounting policies and practices of the Company.

346.    Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the Company's financial statements and accounting policies and practices during the Relevant Period were materially false and misleading.

347.    Defendants owed Plaintiff a duty of reasonable care in connection with the provision of information concerning the financial condition of Vivendi. Defendants Vivendi, Messier and Hannezo breached this duty by including in Vivendi's financial statements untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

348.    Plaintiff, as an investor, was entitled to rely upon, and was justified in relying upon, the representations made by Defendants, set forth above, regarding the Company's financial statements, accounting policies and practices, and compliance with GAAP. Plaintiff relied upon the superior knowledge and expertise of Defendants and justifiably relied to its detriment on Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities.

349.    As alleged above, Defendants materially misrepresented Vivendi's financial results and its compliance with GAAP throughout the Relevant Period.

350.    Plaintiff had no knowledge of the false and misleading nature of Defendants' statements when purchasing and refraining from selling Vivendi's securities, and believed them to be true.  Had Plaintiff been aware of the true facts, it would either not have purchased Vivendi's securities, or would not have purchased the securities at inflated prices.

351.    As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vivendi's securities was artificially inflated and Plaintiff sustained damages in connection with its purchases and holding of Vivendi's securities when the price of the securities declined.

352.    Defendants' conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law.

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

353.    Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

354.    Defendants' scheme to hide Vivendi's liquidity crisis and artificially inflate its share prices through the use of improper accounting methods unjustly enriched Defendants, at Plaintiff's expense, by artificially inflating the price Plaintiff paid for Vivendi securities during the Relevant Period.

355.    Defendants' retention of the unjustly acquired amounts violates the fundamental principles of justice, equity, and good conscience.

139

356.    Accordingly, Defendants should be ordered to return any funds obtained at Plaintiff's expense as a result of their scheme.

## XII.    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment on its behalf and as follows:

1.    Awarding Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

2.    Awarding Plaintiff the right to rescind its Vivendi securities to the extent it continues to hold such securities;

3.    Awarding Plaintiff on the common law fraud claim asserted above an amount of punitive or exemplary damages in an appropriate amount to accomplish the purposes and aims of such damages, in an amount to be determined at trial under appropriate procedures against Defendants;

4.    Awarding Plaintiff the costs of this suit, including reasonable attorneys' and accountants' and experts' fees and other disbursements; and

5.    Awarding Plaintiff such other and further relief as this Court may deem just and proper.



## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: New York, New York
       February 27, 2008

                            **THE SHAPIRO FIRM, LLP**

                            By: _____

                                  Robert J. Shapiro (RS-3220)
                                  Jonathan S. Shapiro (JS-3068)
                            500 Fifth Avenue, 14th Floor
                            New York, New York 10110
                            Telephone: 212-391-6464
                            Facsimile: 212-719-1616

                            *Local Counsel for Plaintiff*

                            **SCHIFFRIN BARROWAY**
                            **TOPAZ & KESSLER, LLP**
                            John A. Kehoe (JK-4589)
                            Stuart L. Berman
                            David Kessler
                            Darren J. Check
                            280 King of Prussia Road
                            Radnor, Pennsylvania 19087
                            Telephone: 610-667-7706
                            Facsimile: 610-667-7056

                            *Attorneys for Plaintiff*